1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF ALABAMA

3                    SOUTHERN DIVISION

4

5    RICHARD MAYFIELD,              °     CIVIL ACTION NO.:

6            Plaintiff,             °       03-0718-WS-M

7    vs.                           °

8    DRUMMOND CO., INC., et al.,        °

9            Defendants.           °

10

11

12

13

14

15

16                    STIPULATIONS

17          IT IS STIPULATED AND AGREED by and

18   between the parties, through their respective

19   counsel, that the deposition of RICHARD MAYFIELD,

20   may be taken before DEANNA F. JONES, Commissioner,

21   at Hand Arendall, L.L.C., 3000 AmSouth Bank

22   Building, 107 St. Francis Street, Mobile, Alabama,

23   on the 4th day of August, 2004.

**EXHIBIT 5**

Page 2

```
1          IT IS FURTHER STIPULATED AND AGREED
2    that the signature to and the reading of the
3    deposition by the witness is waived, the deposition
4    to have the same force and effect as if full
5    compliance had been had with all laws and rules of
6    Court relating to the taking of depositions.
7          IT IS FURTHER STIPULATED AND AGREED
8    that it shall not be necessary for any objections
9    to be made by counsel to any questions except as to
10   form or leading questions, and that counsel for the
11   parties may make objections and assign grounds at
12   the time of the trial, or at the time said
13   deposition is offered in evidence, or prior
14   thereto.
15          IT IS FURTHER STIPULATED AND AGREED
16   that the notice of filing of the deposition by the
17   Commissioner is waived.
18
19
20
21
22
23
```

Page 3

```
1                    INDEX
2
3    EXAMINATION BY:          PAGE NUMBER:
4    Mr. Lankford . . . . . . . . . .   8
5
6
7    EXHIBITS:
8    Defendants' Exhibit 1 . . . . . . .  22
9      (Resume of Richard Mayfield)
10   Defendants' Exhibit 2 . . . . . . .  17
11     (Answers to Interrogatories)
12   Defendants' Exhibit 3 . . . . . . .  56
13     (Spanish Employment Contract)
14   Defendants' Exhibit 4 . . . . . . .  61
15     (Drummond Safety Program)
16   Defendants' Exhibit 5 . . . . . . .  89
17     (Photos and Manual of Hydro Unit)
18   Defendants' Exhibit 6 . . . . . . . 116
19     (Sketch of Port Area)
20   Defendants' Exhibit 7 . . . . . . . 135
21     (Accident Report)
22   Defendants' Exhibit 8 . . . . . . . 143
23     (Photos of Vessels)
```

Page 4

```
1    Defendants' Exhibit 9 . . . . . . . 152
2      (Preliminary Buoy Research Report)
3    Defendants' Exhibit 10  . . . . . . 141
4      (Version of Person Involved/Witness)
5    Defendants' Exhibit 11  . . . . . . 142
6      (Photos of COLOMBIA 4)
7    Defendants' Exhibit 12  . . . . . . 149
8      (Vessel Construction Diagrams)
9    Defendants' Exhibit 13  . . . . . . 153
10     (Fire Systems Check List)
11   Defendants' Exhibit 14  . . . . . . 156
12     (Quick Change Barge Transit Plan)
13   Defendants' Exhibit 15  . . . . . . 157
14     (Safety Drill Instructions)
15   Defendants' Exhibit 16  . . . . . . 160
16     (Repair Orders)
17   Defendants' Exhibit 17  . . . . . . 165
18     (Personal Calendar of Events)
19   Defendants' Exhibit 18  . . . . . . 166
20     (Dive Log)
21   Defendants' Exhibit 19  . . . . . . 166
22     (Compilation of Events from Dive Log
23      and Personal Calendar)
```

Page 5

```
1    Defendants' Exhibit 20  . . . . . . 196
2      (Photograph of Mr. Mayfield)
3    Defendants' Exhibit 21  . . . . . . 201
4      (Spanish Resignation Letter)
5    Defendants' Exhibit 22  . . . . . . 201
6      (6-20-2002 English Resignation Letter
7       and Acceptance of Resignation)
8    Defendants' Exhibit 23  . . . . . . 206
9      (List of Vessels)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 6

1        APPEARANCES
2
3        HAND ARENDALL, L.L.C., by Mr. Alex F.
4   Lankford, III, 3000 AmSouth Bank Building, 107
5   St. Francis Street, Post Office Box 123, Mobile,
6   Alabama 36601, appearing on behalf of the
7   defendant, Drummond Co., Inc.
8
9        Mr. David A. Hilleren, Post Office Box
10  9150, Mandeville, Louisiana 70470, appearing on
11  behalf of the plaintiff, Richard Mayfield.
12
13
14
15
16
17
18
19
20
21
22
23

Page 7

1        I, DEANNA F. JONES, a Court Reporter
2   of Mobile, Alabama, and Notary Public for the State
3   of Alabama at Large, acting as Commissioner,
4   certify that on this date, as provided by the
5   Alabama Rules of Civil Procedure and the foregoing
6   stipulation of counsel, there came before me at
7   Hand Arendall, L.L.C., 3000 AmSouth Bank Building,
8   107 St. Francis Street, Mobile, Alabama, beginning
9   at 9:55 a.m., RICHARD MAYFIELD, witness in the above
10  cause, for oral examination, whereupon the
11  following proceedings were had:
12            RICHARD MAYFIELD,
13  the witness, having been first duly sworn by the
14  Court Reporter, was examined and testified as
15  follows:
16
17        THE COURT REPORTER:  Usual stipulations
18  okay?
19        BY MR. HILLEREN:  That's fine.
20        BY MR. LANKFORD:  Usual.  Is that all
21  right with you?
22        BY MR. HILLEREN:  Uh-huh.  (Counsel
23  indicates affirmatively.)

Page 8

1            EXAMINATION
2   BY MR. LANKFORD:
3        Q   You are Mr. Richard Mayfield, the
4   plaintiff in this lawsuit?
5        A   Yes.
6        Q   Your counsel has handed me a CD-ROM with
7   your 2001 tax return and your 2003 tax return; is
8   that right?
9        A   Yes.
10       Q   And do you know the gross income of your
11  joint return filed for 2001, do you remember?
12       A   No, I don't.
13       Q   And what is your answer as to your tax
14  return for 2003?
15       A   It's -- It's on there.  I don't recall
16  the exact amount.
17       Q   That's last year.  You don't remember the
18  gross income for you and your wife, approximately?
19       A   No.  No, you'd have to look at it and
20  see.
21       Q   Is it a hundred thousand dollars?
22       A   I said no, you have to look at it and
23  see.

Page 9

1        Q   You don't remember?
2        A   No, sir.
3        Q   Is it between seventy-five and a hundred
4   thousand?
5        A   I just told you no.
6        Q   No what?
7        A   No, I don't remember.  Twice.
8            It's on there if you'd like to look at
9   it.
10           BY MR. HILLEREN:  I have a Social
11  Security record that I furnished that lists out his
12  income for the different years.
13           BY MR. LANKFORD:  I don't think it was
14  2003, though.
15           BY MR. HILLEREN:  No, not 2003.
16       Q   (BY MR. LANKFORD:)  The accident, there's
17  an accident referred to here on 6-2-2003.  What
18  does that involve?
19       A   I got rear-ended coming off the
20  interstate.  I was stopped, and a woman ran in the
21  back of me.
22       Q   Did you receive medical attention because
23  of that?

Page 10

1    A   Yes.
2    Q   And where did this occur?
3    A   On the exit ramp off of Interstate 10
4   onto Causeway Boulevard in New Orleans.
5    Q   And what doctor did you see?
6    A   Dr. Chehardy, emergency room doctor.
7    Q   Where?
8    A   In Lakeview Regional Medical Center in
9   Mandeville, Louisiana.
10   Q   What were your injuries?
11   A   It was just precautionary.  I had a sore
12  neck, they took some x-rays and let me go home.
13   Q   Have you received any more medical
14  attention for any --
15   A   No.
16   Q   -- injuries suffered as a result of this
17  rear-ending?
18   A   No.
19   Q   This affected your neck and not your
20  lower back?
21   A   Yes.
22   (Whereupon, a discussion was had off the
23   record.)

Page 11

1    Q   (BY MR. LANKFORD:)  Mr. Mayfield, as you
2   know, I represent Drummond in this matter.  And
3   have you ever testified before in court?
4    A   Yes.
5    Q   How many times?
6    A   About four times.
7    Q   As an expert witness?
8    A   Yes.
9    Q   In what fields?
10   A   Automotive and commercial and sport
11  diving.
12   Q   In automotive, would that relate to
13  proper repair or maintenance of engines?
14   A   It covered all fields.  Several times
15  it's been accidents; several times it's been to
16  look over equipment.
17   Q   Several times it's been what?
18   A   To look over different automotive
19  equipment after accidents.
20   Q   And in the sports diving, what was the
21  nature of where you testified in that?
22   A   Was a income tax evasion involving a
23  death in sport diving.  It was in the Eighth

Page 12

1   Federal District Court.
2    Q   Death of a diver?
3    A   Well, supposedly.  Never did find the
4   guy.
5    Q   And that was in the Eighth Federal Court?
6    A   Right.
7    Q   And the name of the case?
8    A   I don't recall.
9    Q   When?
10   A   It was about five years ago, five, six
11  years ago.
12   Q   Okay.  What about commercial diving?
13   A   I have done half a dozen of those.
14   Q   Half a dozen cases?
15   A   Yes.  Not all of them have gone -- gone
16  to trial.
17   Q   What was the nature of those cases,
18  please, sir?
19   A   Was diving, commercial diving accidents
20  involving either injury or improper decompression
21  or treatment.
22   Q   Did you testify on behalf of plaintiffs
23  in those cases?

Page 13

1    A   Both plaintiff and defendant.
2    Q   And what, do you remember the names of
3   any of those cases?
4    A   No, I don't.
5    Q   Where were they tried or was your
6   testimony taken?
7    A   Some of them -- Let's see, a couple of
8   them were in Lafayette, Louisiana; two of them were
9   in Houston; couple of them were in New Orleans.
10   Q   In Federal Court?
11   A   Yes.
12   Q   Who were the lawyers involved in any of
13  these cases?
14   A   I don't recall.
15   Q   Did you receive expert witness fees?
16   A   Yes.
17   Q   And how much was that?
18   A   Usually anywhere from a hundred and fifty
19  to two hundred dollars an hour.
20   Q   Mr. Mayfield, I'm showing you some
21  answers to interrogatories or questions that
22  were filed.  I filed the questions, and you
23  submitted the answers.  Your lawyer signed the

1 interrogatories or these answers, and the party's
2 supposed to sign them.
3  BY MR. LANKFORD: With your -- If your
4 lawyer has no objection, I'd like for him to sign
5 these on the last page.
6  BY MR. HILLEREN: Okay. Can we run
7 through them real quickly?
8  BY MR. LANKFORD: Sure. Take your time.
9
10  (Whereupon, there was a brief recess had in
11  the deposition.)
12
13  BY MR. HILLEREN: He saw this individual
14 one time.
15  THE WITNESS: That was prior to seeing
16 Dr. Fleet, and she advised me to see a specialist.
17 She said I was a walking time bomb, that I needed
18 to go see somebody more --
19  BY MR. HILLEREN: We need to add her to
20 supplement Numbers 1 and 2.
21  Q (BY MR. LANKFORD:) Are these -- Do
22 you wish to supplement your answers to these
23 interrogatories, and if so, would you specify?

1  BY MR. HILLEREN: Yes, I will. With
2 respect to Answer Number 1, calling for the names,
3 addresses and telephone numbers of individuals
4 likely to have discoverable information, we would
5 like to add Dr. Rachel Mia, M-I-A, Murphy, 2639
6 North Causeway Boulevard, Mandeville, Louisiana,
7 who is a board certified internal medicine doctor.
8 An individual named Harry Hughes, also.
9  Q (BY MR. LANKFORD:) Harry Hughes. And
10 who is Harry Hughes?
11  A Harry was the maintenance superintendent
12 at Drummond, and he was also a resident Drummond
13 employee in Colombia.
14  BY MR. HILLEREN: Okay. And the last
15 individual with respect to Number 1 answer is
16 Dr. Garcia, who's the medic that attends Drummond
17 personnel in Colombia.
18  THE WITNESS: Right. He was the doctor
19 on site that initially saw me.
20  BY MR. HILLEREN: So those three
21 individuals would supplement Number 1, and the
22 two doctors, Dr. Garcia and Dr. Murphy, would
23 supplement Number 2, calling for expert witness

1 information.
2  Number 3 -- Well, we don't need to do
3 anything with 3.
4  Going over to Number 7, it says,
5 please identify all doctors, psychiatrists and
6 other medical and mental health care professionals
7 with whom you consulted or from whom you received
8 treatment within the last five years. Again, that
9 would be Dr. Garcia and Dr. Murphy, as we
10 specified.
11  And other than that, we don't need to
12 supplement or amend the answers.
13  Q (BY MR. LANKFORD:) All right. Then with
14 those amendments that you have just stated on the
15 record, Mr. Mayfield, are these answers to these
16 interrogatories true and correct to the best of
17 your knowledge, information and belief?
18  A Yes.
19  Q Then I'd like for you to date and sign
20 those answers, please, sir.
21  A Okay.
22  (Witness complies.)
23  BY MR. LANKFORD: I'm going to mark that

1 as Exhibit 2. I'll give you 1 in just a second.
2
3  (Whereupon, Defendants' Exhibit 2 was marked
4  for identification and copy of same is
5  attached hereto.)
6
7  Q (BY MR. LANKFORD:) Referring to Exhibit
8 2, Mr. Mayfield, please, sir, in number -- your
9 response to Question Number 1 on page 1?
10  A Uh-huh. (Witness indicates
11 affirmatively.)
12  Q You mention Lloyd McEntire, and you say
13 Massachusetts, USA.
14  A Right.
15  Q Whereabouts in Massachusetts?
16  A I don't know.
17  Q Have you talked to Mr. McEntire since
18 this suit's been filed?
19  A No.
20  Q Have you e-mailed him?
21  A No.
22  Q You have no communication with him?
23  A I don't know how to get in contact with

Page 18

1  him.
2      Q    What about the diver, Mero Mero, what is
3  his address and telephone number?
4      A    Don't know.
5      Q    What about, who is Eurolatina Alvaro
6  Gonzales?
7      A    He's a surveyor that I worked with.
8  Whenever the ships came in, we had to do a survey
9  of the ship prior to loading, and after the ship
10 was loaded we had to do another survey after the
11 ship was loaded to verify the cargo was correct.
12 And he's just one of the Eurolatina people that I
13 worked with; there was about six of them, but I
14 don't recall the rest of them's names.  I just
15 happened to have his business card.
16     Q    How about Jorge Luis Perez, who is he?
17     A    He's another surveyor.
18     Q    So part of your job with Drummond was to
19 make a visit and board the vessels waiting to be
20 loaded with coal, and inspect them for hold damage
21 and that kind of thing?
22     A    When a new ship came in, we had to verify
23 the anchorage was correct and then take the cranes

Page 19

1  out to the vessel, tie up alongside, go aboard the
2  ship, inspect the cargo holds and make sure they
3  were clean, discuss the loading with the captain
4  and the chief engineer and do a load plan, and
5  explain to the captain and the chief engineer all
6  the rules and requirements of Drummond for ships in
7  the port prior to loading.
8          And they had to sign off documentation,
9  and I had to sign off documentation prior to
10 loading.  After that was done, we'd commence
11 loading.
12     Q    With the preloading inspection, did you
13 go down into the holds?
14     A    No.
15     Q    You just eyeballed them up on deck?
16     A    All cargo holds were open and you could
17 see down into the holds easily.
18     Q    Did you note any particular damage from
19 buckets or anything?
20     A    That was after we were loaded.  What
21 we were looking for initially was cleanliness
22 of the holds so the cargo wouldn't be
23 contaminated.

Page 20

1      Q    All right.
2      A    Or if they had any previous cargo in the
3  holds that would affect the loading -- not the
4  loading, but the calculated weights.
5      Q    All right.  Gary Sloan, you list him.
6  Where does he live?
7      A    Don't know.
8      Q    Have you talked to him since you filed
9  the lawsuit?
10     A    No.
11     Q    Have you e-mailed him?
12     A    No.
13     Q    Did he have a little watch camera?
14     A    Yes.
15     Q    And did he take pictures of people from
16 time to time?
17     A    I don't know.  I know he had it; I don't
18 know how he used it.
19     Q    Have you seen any of the pictures he ever
20 took?
21     A    No.
22     Q    You mentioned in your answer to Number 6
23 here about Ocean Technology, Linden Leask,

Page 21

1  L-E-A-S-K, that's on page 4?
2      A    Yeah, Linden Leask.
3      Q    Yeah.  Who is he?
4      A    He's my supervisor, my boss at Oceans
5  Technology.  He's the company owner.
6      Q    Okay.  Page 5, the response to Question
7  Number 8, you say you functioned as a ship's
8  officer on Drummond's behalf?
9      A    Uh-huh.  (Witness indicates
10 affirmatively.)
11     Q    Is that with regard to the oceangoing
12 vessels that came to be loaded at -- What ship are
13 you talking about?
14     A    Drummond's fleet.
15     Q    Drummond's fleet?
16     A    Yeah.
17     Q    Okay.  So you're not taking about
18 third-party ships?
19     A    No.
20     Q    You're talking about Drummond's fleet; is
21 that right?
22     A    Yes.
23

Page 22

1    (Whereupon, Defendants' Exhibit 1 was marked
2      for identification and copy of same is
3      attached hereto.)
4
5    Q   (BY MR. LANKFORD:)  Okay.  All right.
6  Mr. Mayfield, I show you Exhibit 1, which purports
7  to be your resume.  And I wanted to ask you some
8  questions about that.
9    A   All right.
10    Q   Is that a current resume?
11    A   Yes.
12    Q   Do you have a college degree?
13    A   Yes.
14    Q   And is that from -- From where, please,
15  sir?
16    A   Almeda College and University.
17    Q   Where is that located?
18    A   Ohi- -- Iowa, I'm sorry.
19    Q   Whereabouts in Iowa?
20    A   I don't know, let me look.  I forget
21  exactly.
22      I have to look it up, but it's in Iowa.
23    Q   This was granted to you, according to the

Page 23

1  document I have, on May 14, 2003?
2    A   Right.
3    Q   Is that correct?
4    A   Right.
5    Q   And that's a Bachelor of Science?
6    A   Yes.
7    Q   In what kind of specialty, major?
8    A   Engineering technology.
9    Q   And what kind of engineering field would
10  that cover?
11    A   It's not any specific engineering field,
12  it's just engineering technology.  It's a
13  general -- general engineering degree.
14    Q   Would that cover civil engineering?
15    A   No.
16    Q   Would it cover mechanical engineering?
17    A   No.
18    Q   I'm a little bit -- I don't know which --
19  It ought to cover one of those, shouldn't it?
20    A   No, it doesn't.
21    Q   Does it cover marine engineering?
22    A   It's general engineering studies.
23    Q   How many hours did it take to get that

Page 24

1  degree?
2    A   Took me a couple of years.
3    Q   Correspondence?
4    A   Internet.  It's a life experience degree
5  plus some Internet correspondence.
6    Q   How many years did it take you?
7    A   I just said two.
8    Q   You and I are going to get along pretty
9  well.  I don't need any backtalk from you, I don't
10  want any smart talk from you.  I don't want any
11  problems with you.  So if you don't mind, just
12  answer my question and don't say how many times
13  I've asked you; is that all right?  Do we
14  understand each either?
15    A   As long as you understand that I answered
16  you the first time.
17      BY MR. HILLEREN:  Let's not let
18  personalities get involved with this.
19      BY MR. LANKFORD:  I agree with you, I
20  agree with you.
21    Q   (BY MR. LANKFORD:)  Can you estimate how
22  long, how many hours it took you to get this
23  degree?

Page 25

1    A   No.
2    Q   And you can't remember where in Iowa that
3  it's located?
4    A   I've got it written down at home
5  someplace.
6    Q   Have you ever been to the campus?
7    A   No.
8    Q   Now, the first thing I see here is
9  that -- on Exhibit 1, is that you have gone to the
10  University of the North in Colombia for four
11  hundred and twenty class hours in Spanish language;
12  is that correct?
13    A   It was four hundred and twenty hours by a
14  professor from the University Del Norte.
15    Q   And that was in the year 2002?
16    A   No, that was from -- That's when I
17  finished, approximately.
18    Q   Well, it says 2002?
19    A   Yeah, it does.
20    Q   And so I'm asking you, is that from
21  January 1, 2002, until you left, which was June the
22  20th, 2002?
23    A   That was from when I was hired on at

Page 26

1  Drummond to work in Colombia until I left. They
2  had a professor from the University Del Norte
3  on-site, and we went to Spanish class approximately
4  an hour, hour and a half a day while we were
5  working.
6      Q   So when it says that you got four hundred
7  and twenty hours in 2002, that's not correct, is
8  it?
9      A   It's pretty much correct. That's all the
10 hours I spent working going to Spanish classes at
11 the port while I was there.
12     Q   Well, this says to me --
13     A   That's as close -- It's as close as I can
14 estimate it.
15     Q   Well --
16     A   You work thirty-five weeks a year, and I
17 was there, you know, a little bit of time.
18     Q   So this is not -- This is an estimate on
19 your part?
20     A   Yes, sir, it is.
21     Q   It's not -- When you say four hundred and
22 twenty hours, you didn't keep any records, did you?
23     A   No.

Page 27

1      Q   And you didn't go to class every day it
2  was offered, either, did you?
3      A   Most time -- Most of the time. I went to
4  class pretty religiously.
5      Q   Well, would you be surprised if the
6  University said that in 2000 -- in January you went
7  to class three out of eleven hours, would that
8  surprise you?
9          BY MR. HILLEREN: In 2002?
10         BY MR. LANKFORD: Yes, 2002. Because
11 that's what his -- you know, that's what his resume
12 says.
13         BY MR. HILLEREN: I thought you said
14 2000.
15         THE WITNESS: It's an estimate.
16     Q   (BY MR. LANKFORD:) And in February,
17 according to the University, in 2002 you went to
18 class two out of nine hours, would that surprise
19 you?
20     A   Yes, it would, very much.
21     Q   And in March of 2002, would it surprise
22 you if their records show that you went to class
23 seven out of eleven hours?

Page 28

1      A   Yes, it would.
2      Q   And April, seven out of twelve hours?
3      A   Yeah.
4      Q   And in May, seven out of eleven hours?
5      A   I really don't know. We worked the first
6  week at night shift, the second week on the day
7  shift.
8      Q   And in June, zero out of the four
9  classes?
10     A   No, that's not true.
11     Q   And that in the year 2002, would it
12 surprise you that their records show that you
13 attended only twenty-six out of fifty-eight
14 programmed hours?
15     A   No, that's wrong.
16     Q   That's wrong?
17     A   Yeah.
18     Q   Okay. Have you got attendance records
19 where you signed and were there and so forth?
20     A   No, no.
21     Q   You don't have that?
22     A   They didn't -- They didn't have any.
23     Q   And who was your teacher in 2002?

Page 29

1      A   Adriana.
2      Q   Adriana who?
3      A   I don't -- don't remember her last name.
4      Q   And what level did you achieve in this
5  class?
6      A   Don't know.
7      Q   Would beginner sound about right to you?
8      A   Yeah, I'm sure it was.
9      Q   Okay. So, you didn't mean to say that in
10 2002, as it says on Exhibit 1, you logged in four
11 hundred and twenty hours; is that correct?
12     A   No, that was ending in 2002, I had
13 approximately four hundred and twenty hours from
14 the time I started with Drummond to the time I
15 left.
16     Q   The second item on Exhibit 2 (sic) is
17 that you, in 2002 you attended and had ninety hours
18 of personnel management?
19     A   Uh-huh. (Witness indicates
20 affirmatively.)
21     Q   Is that true?
22     A   Don't know if it was University Del
23 Norte. It was a Dale Carnegie type class that

Page 30

1   Drummond required us to attend, and we attended as
2   a group for several weeks.
3       Q   Who taught that?
4       A   I don't remember the guy's name.
5       Q   Was he from Drummond?
6       A   No.
7       Q   He's --
8       A   Francisco something, I believe.
9           No, he was a guy that Drummond hired.
10  They had a conference room with a bunch of
11  Colombian supervisors and American supervisors.
12  In the back of the room there was translators,
13  and we had ear sets translating the Spanish
14  speakers to English and English speakers to
15  Spanish.
16      Q   So the second item here is not correct
17  either, where you said the Universadad Del Norte.
18  It wasn't that at all, was it?
19      A   I'm not sure what it was.  I was told
20  that it may have been through that university.  We
21  weren't given any specific information on where the
22  guy originated from.
23      Q   So you don't know whether it was the

Page 31

1   University Del Norte, or Drummond, or Dale Carnegie
2   or whoever, do you?
3       A   No, I don't.
4       Q   Okay.  So, but you said and specified the
5   University of the North, didn't you?
6       A   Yes, I did.
7       Q   All right.  Are you a present member of
8   the American Society of Mechanical Engineers?
9       A   Yes.
10      Q   Current member?
11      A   Yes.
12      Q   Okay.  And how about the ASQ, are you a
13  current member of that?
14      A   No, I dropped that membership.
15      Q   When did you do that?
16      A   Recently.
17      Q   How recent?
18      A   Last time they wanted me to renew, I
19  guess in I think February.
20      Q   Of this year?
21      A   Yeah.  I didn't drop it, I just didn't
22  renew it.
23      Q   Are you a member of the ASE?

Page 32

1       A   Yes.
2       Q   Current member?
3       A   Yes.
4       Q   And certified as a Master Mechanic of --
5       A   Automotive.
6       Q   Gasoline and diesel?
7       A   No, just gasoline.
8       Q   All right.  U.S. Merchant Marine, you're
9   a Qualified Member of the Engineering Department,
10  Ordinary Seaman.  Is that current?
11      A   Yes.
12      Q   You sure?
13      A   It doesn't expire.  I've got a Z card
14  with no expiration date.
15      Q   You don't have to renew that every five
16  years?
17      A   No, no expiration date on it.  I believe
18  you have a copy of it.
19      Q   And you're a member of the Professional
20  Association of Diving Instruction -- Instructors?
21      A   Yes.
22      Q   Current?
23      A   Yes.

Page 33

1       Q   And you've been designated as a
2   Divemaster?
3       A   I'm a PADI Divemaster.
4       Q   A what?
5       A   PADI, Professional Association of Diving
6   Instructors.  I'm a PADI Divemaster.
7       Q   What does that mean?
8       A   It means that I'm qualified in most
9   aspects of SCUBA diving.
10      Q   What aspects are you not qualified to do?
11      A   PADI just -- just encompasses SCUBA
12  diving only.
13      Q   Well, I thought you said you were not
14  qualified in all aspects of SCUBA diving.  Did I
15  misunderstand you?
16      A   There's other -- other types of diving
17  besides SCUBA diving.  PADI only addresses SCUBA
18  diving.
19      Q   So, do I understand that you're a
20  Divemaster of SCUBA diving only?
21      A   Yes.
22      Q   In all aspects of SCUBA diving?
23      A   Right.

Page 34

1    Q   What did you have to do to achieve that?
2    A   Well, I was a Navy diver, went through
3  all their courses, took some -- some in-water
4  courses and class courses, and then got certified
5  in 1976 as a PADI Divemaster.
6    Q   How long -- Do you have to keep renewing
7  that?
8    A   No.
9    Q   That's a lifetime deal whether you dive
10  or not?
11    A   Yes.  The only time you have to renew it
12  is if you step up to becoming an instructor.
13    Q   Association of Diving Contractors, are
14  you a current member of that?
15    A   Yes.
16    Q   And does it recognize the designation of
17  Divemaster?
18    A   No.  Doesn't recognize SCUBA diving
19  qualifications.
20    Q   Why is that?
21    A   Because it's a commercial diving
22  organization and they don't recognize sport diving
23  associations.

Page 35

1    Q   You have working knowledge of
2  specifications, what is the ASNT?
3    A   ASME -- ASNT is American -- It's a steel
4  specification, structural steel specification.
5    Q   And AISC?
6    A   Same thing, different -- different group.
7    Q   And you mentioned Lloyds Register.
8  That's a registration of vessels entered into --
9  that people insure at Lloyds, isn't it?
10    A   No, it's a specification society that
11  gives various criteria for building various types
12  of vessels.
13    Q   Like DNV?
14    A   Similar, yeah.  DNV, ABS, and Lloyds
15  Register are all very similar.
16    Q   All right.  Let's go down to your
17  professional experience.  Are you presently
18  employed with Oceans Technology?
19    A   Yes.
20    Q   As a third party inspector?
21    A   Right.
22    Q   What does that mean?
23    A   I go out as a company representative for

Page 36

1  various types of construction jobs, both offshore
2  and onshore.
3    Q   Is Oceans Technology in the business of
4  doing what?
5    A   Providing -- Providing representation for
6  clients for various types of jobs.
7    Q   Would these be on behalf of owners who
8  have projects under construction?
9    A   On behalf of companies.
10    Q   Who are owners of the structure?
11    A   Yes.
12    Q   And what do you do in that connection?
13    A   I get a scope of work for each job, and
14  each job's different, has different aspects to it.
15  I make sure the scope of work's adhered to and all
16  the specifications that are included with the scope
17  of work are adhered to, and I take care of any
18  other things that the client would like me to.
19    Q   In other words, if the contractor is not
20  living up to the specs, you bring that to the
21  contractor's attention?
22    A   And the client.
23    Q   And the owner, your client?

Page 37

1    A   Yes, yes.
2    Q   And it's either resolved through an
3  additional work order or some kind of resolution?
4    A   Correct.
5    Q   And that's your job to act as liaison and
6  do that?
7    A   Yes, sir.  Yes.
8    Q   And some of this work is offshore?
9    A   Most of it is.
10    Q   And does that mean that you will go
11  offshore to structures, and platforms, and so
12  forth?
13    A   Yes.
14    Q   And does that involve going by vessel?
15    A   Yes.
16    Q   Does it involve going by helicopter?
17    A   Yes.
18    Q   And does it involve being lifted up in
19  baskets from decks of vessels onto platforms?
20    A   Yes.
21    Q   And does it involve climbing ladders?
22    A   No.
23    Q   It involves a considerable amount of

Page 38

1    physical activity, does it not?
2        A   No, not really.
3        Q   Not really?
4        A   No.
5        Q   Okay.  You just kind of walk around, look
6    around?
7        A   Yeah.
8        Q   You don't go down into any holds or
9    anything like that?
10       A   No.  I oversee other people doing that.
11       Q   Okay.  Are you able to do that work
12   physically?
13       A   Not -- Not as much as I used to, no.
14       Q   But are you able to perform your tasks
15   for Oceans Technology?
16       A   Yes.
17       Q   Okay.  And how much are you getting paid
18   by Oceans Technology?
19       A   Thirty dollars an hour.
20       Q   Do you do any underwater inspection?
21       A   No.
22       Q   Do you do any work on land?
23       A   Yes.

Page 39

1        Q   And what kind of structures?
2        A   Usually on land work I go to fabrication
3    facilities and monitor their quality.  Sometimes I
4    do visual inspections of welds, witness hydro
5    tests.
6        Q   And this is in the fabrication as opposed
7    to the erection stage?
8        A   Yeah, it's just fabrication.
9        Q   You don't go into the erection?
10       A   No.
11       Q   All right.  And the next item I see is
12   10-99 through 7-02, this is the same exhibit, you
13   worked for Drummond.  And you said you were --
14   And I'm reading this:  You direct the marine
15   activities relating to loading ships, you direct
16   the maintenance activities of all marine assets,
17   and you direct and perform all diving-related work.
18       A   Yes.
19       Q   Does that mean that you're the boss?
20       A   No.
21       Q   What does it mean?
22       A   It means after I am given my
23   instructions, I carry them out.

Page 40

1        Q   Who gave you your instructions at
2    Drummond?
3        A   Lloyd McEntire, and later on Don
4    Hamilton.
5        Q   So you didn't mean by saying that you
6    direct, that you were the boss?
7        A   No, not at all.
8        Q   What is a diving officer, who is that?
9    You said that you were.
10       A   That was the designation that Lloyd
11   McEntire gave me.  He asked me if I wanted to
12   do it, if I would do it, and I told him I would
13   if nobody else would.  He said I was the best
14   qualified, so I told him I'd help him out with it.
15       Q   And that wasn't -- You weren't hired on
16   as a diving officer, were you?
17       A   No.
18       Q   And what does diving officer, what does a
19   diving officer do?
20       A   That was Lloyd's designation.  He just
21   wanted me to make sure all the equipment was safe,
22   all the divers were qualified, and that when we
23   did have to perform a dive that it was done in a

Page 41

1    manner that was safe as it could be, considering
2    the working circumstances and the limitations we
3    had to work with.
4        Q   That the equipment was safe, that the
5    divers were qualified?
6        A   Uh-huh.  (Witness indicates
7    affirmatively.)
8        Q   And that the diving operation was carried
9    out in a safe manner?
10       A   Yeah, within -- within the limits that we
11   had to work with, the equipment and the -- way
12   we had to work.
13       Q   Well, if a vessel got a wire or a cable
14   in its wheel and you and another diver went out,
15   was it your job to see that the operation was
16   carried out in a safe manner consistent with the
17   conditions that you were working under?
18       A   It was my job to see that the equipment,
19   the tug or whatever, got back, put back in service
20   as soon as possible.
21       Q   But that was your responsibility?
22       A   If I was on shift, yes.
23       Q   If you were on shift, right, of course.

Page 42

1    And you were the boss of the operation,
2  were you not?
3    A  No.
4    Q  Who was?
5    A  Lloyd McEntire.
6    Q  Well, I'm talking about when you were out
7  on the site diving, Mr. McEntire didn't dive with
8  you, who was the boss of the operation?
9    A  The tug captain -- The vessel captain was
10  the boss of the operation.
11    Q  The vessel captain didn't tell you how to
12  dive, did he?
13    A  No.
14    Q  You knew how to dive, didn't you?
15    A  Right.
16    Q  And you were the one responsible for
17  being sure that the diver was qualified, weren't
18  you?
19    A  Right.
20    Q  And you were responsible for being sure
21  that the diving equipment was in good, safe
22  condition, weren't you?
23    A  Right.

Page 43

1    Q  And you were the one to be sure that
2  the dive itself was done in a manner as safe as
3  possible under the given circumstances?
4    A  Yes.
5    Q  And you were the boss in these three
6  areas, weren't you?
7    A  Right, just with regard to diving.
8    Q  Just with regard to diving. That's what
9  diving officer means, doesn't it?
10    A  Yeah. In that definition, yeah.
11    Q  Okay. Now, you said perform -- I'm back
12  to your job description. Perform certified welding
13  inspector related tasks. Did you do that?
14    A  Once or twice.
15    Q  And what were those occasions?
16    A  COLOMBIA 4 had some problems with
17  seawater piping, and I talked to the man, I can't
18  think of the guy's name, Dermott or something like
19  that. He was a big maintenance guy at the mine. I
20  think his name's Dermott or something that starts
21  with D, he's a senior -- senior maintenance guy at
22  the mine, real nice fellow.
23    Q  From Drummond?

Page 44

1    A  Yeah. And he knew I was well-versed
2  in marine stuff and they had problems with the
3  seawater piping, and we discussed how to correct
4  the problems and I gave him my recommendations on
5  what materials to use and how to weld it.
6    Q  Did you do any of the welding yourself?
7    A  No.
8    Q  Did you draw any plans or specs?
9    A  Yes.
10    Q  Are you a certified welder?
11    A  No.
12    Q  Are you a welder at all?
13    A  Yes.
14    Q  And what's your welding experience?
15    A  I can weld fluxcore, mig, tig, stick,
16  heliarc.
17    Q  Aluminum?
18    A  On occasion, not very much.
19    Q  And you said you directed nondestructive
20  testing?
21    A  Right.
22    Q  What was that?
23    A  We did some penetrant testing on some --

Page 45

1  some joints to make sure they weren't cracked.
2    Q  On what vessel?
3    A  COLOMBIA 4 primarily. We had a lot of
4  problems with that vessel.
5    Q  And how did you conduct the
6  nondestructive testing?
7    A  Follow the penetrant testing procedure.
8  We used spray cans.
9    Q  What did that involve?
10    A  Well, you clean the area, get it down
11  to bare metal, spray the penetrant on which is
12  an oil-based dye. You wait for twenty minutes,
13  approximately, let the dye soak into the area you
14  want to find out if there's anything there, and you
15  remove all the dye by wiping it off with clean,
16  lint-free rags. And you spray the developer on it,
17  which is like a talcum powder type spray, and if
18  there's any cracks, the talcum powder spray bleeds
19  the dye out which would be an indication of a
20  crack, porosity, or various other things.
21    Q  Okay. And how many times did you do this
22  testing?
23    A  I don't know, two or three times.

Page 46

1  Q  And in what areas of Number 4?
2  A  In the engine room.
3  Q  Did you find any cracks?
4  A  Yes.
5  Q  Were they repaired?
6  A  Yes.
7  Q  Who repaired those?
8  A  Maintenance department. That's a
9  separate deal at Drummond in Colombia.
10  Q  Were these hull cracks?
11  A  No.
12  Q  Bulkhead cracks?
13  A  No.
14  Q  Where were they?
15  A  Piping, seawater piping.
16  Q  Searex is here on page 2. Did you do any
17  diving with Searex?
18  A  No.
19  Q  Is Searex still in business?
20  A  No.
21  Q  Why did you leave them?
22  A  They went bankrupt.
23  Q  Okay. What about, your next one is Q/A,

Page 47

1  is that quality assurance?
2  A  Yes.
3  Q  For Pool Company?
4  A  Yeah, Pool Offshore.
5  Q  Are they still in business?
6  A  No, they were bought out.
7  Q  Why did you leave them?
8  A  To go to work for Searex. I knew some of
9  the people at Searex, and they recruited me away
10  from Pool.
11  Q  You worked as the chief engineer for Bean
12  Dredging --
13  A  Right.
14  Q  -- for a period, short period of time?
15  A  Yeah.
16  Q  And did you live aboard the dredge?
17  A  No, nobody did.
18  Q  Were the dredges -- What dredge did you
19  work with?
20  A  BOOSTER 25. It was one job up in New
21  York, or Long Island. I just went up there for
22  that one job.
23  Q  So you weren't the chief engineer aboard

Page 48

1  a dredge, were you?
2  A  I was the chief engineer on BOOSTER 25.
3  Q  BOOSTER 25 is not a dredge is it, that's
4  a booster?
5  A  It works downstream of the dredge unit.
6  Q  Right. But it's not the dredge, is it?
7  A  No.
8  Q  So you weren't a chief engineer on any
9  dredge owned by Bean Dredging, were you?
10  BY MR. HILLEREN: I object. I think the
11  booster is an appurtenance of the dredge.
12  Q  (BY MR. LANKFORD:) What dredge was this
13  a booster to?
14  A  I can't think of the name of it. It's a
15  dustpan dredge. Weeks Marine took it over. We
16  were in a joint venture partnership with Weeks
17  Marine.
18  Q  Was the Booster located by the dredge?
19  A  It was downstream about a mile.
20  Q  Was the dredge working?
21  A  Yes.
22  Q  So you stayed ashore, you didn't stay on
23  the dredge itself, did you?

Page 49

1  A  I stayed on the dredge and the booster;
2  the booster's a floating object.
3  Q  You lived on the dredge?
4  A  There's no one -- No one lived on any of
5  the dredges. We worked a shift, got relieved, went
6  ashore.
7  Q  Did you go aboard the booster?
8  A  Yes.
9  Q  Okay. Did you go aboard the dredge?
10  A  Yes.
11  Q  A booster is simply a larger pump to
12  assist in the pumping of more spoil, isn't it?
13  A  Yes, it is.
14  Q  Increases the velocity or the ability to
15  discharge spoil, doesn't it?
16  A  Yes, when you're pumping long distances.
17  Q  All right. MEI Engineering, is it still
18  in business?
19  A  As far as I know, yes.
20  Q  Why did you leave them?
21  A  They didn't have enough work.
22  Q  All right. Why did you leave Bean?
23  A  Job ended, it was only for that one job

13 (Pages 46 to 49)

Page 50

1  in Long Island. When the job was over, they didn't
2  have any more work.
3      Q   The next one is Aqua Tech?
4      A   Right.
5      Q   Is that still in business?
6      A   No.
7      Q   Why is it not in business?
8      A   The owner who was in California that ran
9  three locations, one in Marrero, Louisiana, one in
10  Morgan City, Louisiana, which are the two locations
11  I was responsible for, sold them and decided just
12  to concentrate his efforts on his store in San
13  Diego, California.
14      Q   Next one is Sub-Sea International?
15      A   Uh-huh. (Witness indicates
16  affirmatively.)
17      Q   Is that still in business?
18      A   No.
19      Q   What happened to it?
20      A   They sold out to Global Divers.
21      Q   Did you go with Global Divers?
22      A   No.
23      Q   Why?

Page 51

1      A   They didn't take anybody from Sub-Sea.
2      Q   This says you were a documentation
3  specialist. What is that?
4      A   Mostly quality assurance documentation
5  for all the various diving equipment, compressors,
6  chambers, V-ports, electronic equipment. We had to
7  maintain records of all of those to comply with
8  various Coast Guard CFRs -- NCFRs.
9      Q   Outland Technology, is that still in
10  business?
11      A   Yes.
12      Q   Are you doing any work for them now,
13  presently?
14      A   Once or twice a year, I go over there and
15  do a little something for them.
16      Q   Okay. And how much do you charge them an
17  hour?
18      A   Usually about ten dollars an hour, I
19  don't spend much time over there. My brother owns
20  that company.
21      Q   The next one I see is Production
22  Management Industries, is that still around?
23      A   Yes.

Page 52

1      Q   And why did you leave them?
2      A   I was hired on to bring them through an
3  ASME audit, develop all their manuals to comply
4  with American Society of Mechanical Engineers
5  review. They build pressure vessels, and they
6  wanted the company stamped, so I wrote all the
7  manuals, trained all their people, and implemented
8  all the procedures in the shops. When they got the
9  ASME certificate, my job was finished.
10      Q   Petroleum, Offshore Petroleum, is it
11  still in existence?
12      A   No.
13      Q   Why did you leave there?
14      A   I was only hired to evaluate some surplus
15  equipment they bought from Taylor Diving.
16      Q   That was a month project?
17      A   Yeah.
18      Q   Chemfix Technologies?
19      A   Right.
20      Q   What it that?
21      A   It was a company I worked for as a
22  project manager to treat hazardous and nonhazardous
23  waste.

Page 53

1      Q   These were all shoreside plants?
2      A   Yes. I built five plants for them.
3      Q   You mean the waste treatment part of it
4  or the whole plant?
5      A   It was a slipstream off a waste treatment
6  plant. We installed our equipment to treat their
7  sewage sludge.
8      Q   Okay. Baker CAC?
9      A   Uh-huh. (Witness indicates
10  affirmatively.)
11      Q   What about them?
12      A   I was quality assurance engineer for
13  them, supervisor. It was a large machine shop
14  operation mostly, and we had to comply with
15  ASME Safety, Pollution and Prevention equipment
16  requirements for offshore valves.
17      Q   This was a land-based job?
18      A   Yes.
19      Q   And why did you leave them?
20      A   They sold out, moved everything to
21  Houston.
22      Q   Taylor Diving?
23      A   Yeah, I worked for them for quite a long

Page 54

1   time.
2   Q   Are they still in business?
3   A   No.
4   Q   What happened to them?
5   A   They closed up.
6   Q   And did you dive for them?
7   A   Yes.
8   Q   As a diver, not as a tender?
9   A   Well, you go through stages, tender,
10  diver, diving supervisor, superintendent, then I
11  moved ashore and became a quality assurance
12  supervisor.
13  Q   How long were you ashore?
14  A   Probably three years out of the time that
15  I worked there.
16  Q   Have you done any deep diving?
17  A   Yes.
18  Q   Have you dived in the North Sea?
19  A   Yes.
20  Q   For whom did you work?
21  A   Taylor Diving.
22  Q   What are the depths of the North Sea
23  diving that you did?

Page 55

1   A   Little under a thousand feet, deepest
2   depth.
3   Q   Did you ever dive in a hundred-foot waves
4   around you?
5   A   No.
6   Q   Is that when you were stationed in
7   Scotland?
8   A   Stationed in Scotland -- We did a job in
9   Teesside, Scotland, yeah.
10  Q   I see on your resident foreign
11  experience, you say Scotland.
12  A   We did a job in Teesside, Scotland, but I
13  wasn't stationed there.
14  Q   Was that for Taylor?
15  A   Yes.
16  Q   Okay. Where were you stationed?
17  A   Aboard a pipe-laying barge offshore from
18  Teesside, Scotland. And then we did diving inshore
19  as the pipeline went across a golf course.
20  Q   Who is Mandina's Inspection Service?
21  A   It's a company that provides inspection
22  services and training through industry.
23  Q   Where is that located?

Page 56

1   A   In Harvey, Louisiana. He's Level III
2   ASNT qualified in pretty much all disciplines. He
3   runs a training service there.
4   Q   Okay. You've told us that you're a
5   master automobile technician. Does that mean
6   mechanic?
7   A   Yes, sir.
8   Q   Okay. And then there's a letter here
9   from a lawyer named Hoffman that says you testified
10  in a case -- This is written in 1983 -- involving
11  Peters versus Martech.
12  A   Uh-huh. (Witness indicates
13  affirmatively.)
14  Q   You're aware of that?
15  A   Yeah, that's probably one of the cases I
16  was talking about.
17  Q   Okay. This is the Z card that you're
18  talking about, right?
19  A   Right.
20
21      (Whereupon, Defendants' Exhibit 3 was marked
22      for identification and copy of same is
23      attached hereto.)

Page 57

1   Q   (BY MR. LANKFORD:) I show you Exhibit 3,
2   and your lawyer will hand it to you will be the
3   easiest thing, which appears to be a, in Spanish
4   your agreement with Drummond; is that correct?
5   A   I suppose. They told me just sign it.
6   Q   So you didn't know what you signed?
7   A   No, I can't read it.
8   Q   Can't read Spanish?
9   A   No.
10  Q   Can you translate anything in that
11  document?
12  A   My name, work, supervisor, operation,
13  marinas, the word work keeps coming up, name of the
14  company. At the time that this was given to me, I
15  knew less than what I know now.
16  Q   What do you mean by that?
17  A   Well, I mean, this was given to me early
18  on when I started with the company, which I had
19  pretty much no knowledge of the Spanish language at
20  all. And I asked him what it was, and he said it's
21  just standard, everybody signs it, just go ahead
22  and sign it.
23  Q   Okay. Well, were you misled in any way?

1    A   Well, I hope I wasn't.  I mean --
2    Q   If you were, say so.
3    A   I was -- I was trusting them to be up
4  front with me.  And they said everybody signs it,
5  it's standard.
6    Q   Okay.
7    A   So I said, okay, is that a requirement
8  for the job?  And he said, yeah.  So I signed it.
9    Q   All right.  The question is:  Have you
10  been misled in any way in signing this contract?
11    A   Only in regard to I don't know what
12  it was, other than it was a requirement for
13  employment.
14    Q   Okay.  Have you seen an English
15  translation of it?
16    A   No.  I don't think I have.
17    Q   All right.  And the only words you can
18  tell me that you can recognize in Spanish is your
19  name, and the word work, and something about marine
20  supervision?
21    A   Well, I think the top, as I understand
22  it now, says individual contract for work of an
23  indefinite term.  I believe that's the translation

1  of the title of it.  Like I said, it was -- you
2  know, they told me it's standard, everybody signs
3  it, so that's what I did.
4    Q   You're not claiming, are you, that
5  Drummond betrayed any trust that you put in them?
6    A   No.
7    Q   Thank you.
8        THE WITNESS:  Is that the same thing?  I
9  wish they would have given me that to begin with, I
10  haven't ever seen that one.
11    Q   (BY MR. LANKFORD:)  I gave it to your
12  lawyer.
13    A   Yeah.  That would have been a lot easier.
14    Q   When did you start working for Drummond?
15    A   I think --
16    Q   It's on that contract.
17    A   -- November '99, I believe.
18    Q   It's -- Look at the date on the contract.
19    A   Yes, 10-99.
20        BY MR. HILLEREN:  Could we take a break?
21        BY MR. LANKFORD:  Yeah.
22    (Whereupon, there was a brief recess had in
23      the deposition.)

1    Q   (BY MR. LANKFORD:)  Look at your contract
2  there and see if it doesn't say October 23, 2000.
3    A   (Witness perusing documents.)
4        Yes, it does.
5    Q   Okay.  So the resume is not correct when
6  it says 10-99; it should be 10-2000, right?
7    A   No, the resume is correct.  This wasn't
8  given to me as soon as I got there.
9    Q   Oh, you went to work in October working
10  without a contract, October of '99?
11    A   Right, yeah.
12    Q   Okay.
13    A   No, I didn't get this till much later.
14  It was like an oversight, they forgot to give me.
15  They weren't very organized when I first got there.
16  I think -- I think there was a transition between
17  management that wasn't there and that was there and
18  new management.
19    Q   Okay.  And you've testified I think your
20  immediate boss was Lloyd McEntire?
21    A   Right.
22    Q   And did Mr. McEntire give you some
23  special projects when you first got there?

1    A   Yes.
2    Q   Okay.  I'll talk about them in just a
3  little bit.
4        The safety, Drummond's safety program is
5  the next thing I come to, I think.
6        BY MR. HILLEREN:  Okay.
7        BY MR. LANKFORD:  All right.  Let me see
8  something here just a second.
9
10    (Whereupon, Defendants' Exhibit 4 was marked
11      for identification and copy of same is
12      attached hereto.)
13
14    Q   (BY MR. LANKFORD:)  I show you some
15  documents marked Exhibit 4 and ask you to look at
16  those, please, sir?
17    A   Okay.
18        (Witness perusing documents.)
19        Okay.
20    Q   Did Drummond have a safety program for
21  shore and offshore work?
22    A   I don't know.  I think they did, but I'm
23  not sure.

Page 62

1    Q   Didn't you attend, looking at Exhibit 4,
2   didn't you attend some of their safety program?
3    A   No.
4    Q   Did not?
5    A   No. There were no safety classes. I
6   was given a little book when I first got there,
7   little small book. They said, read it and sign it,
8   and tore off a card in the back, and that was it.
9    Q   You didn't go to a confined space
10  training? Look at Exhibit 4. Isn't that your
11  signature?
12   A   Well, maybe I did. That is my signature.
13   Q   Well, is that important, to go to a
14  confined space training?
15   A   It was important that -- I brought it up
16  several times that because we had people going down
17  in holds without doing the proper checks, which is
18  something I knew about already.
19   Q   That's very dangerous, it can be, in a
20  closed, confined --
21   A   Yes. That's why as a supervisor I
22  brought it up to management.
23   Q   And so they held a confined space

Page 63

1   training on January the 23rd, 2001, which you
2   attended, didn't you?
3    A   Apparently, yes.
4    Q   Did you learn anything from that?
5    A   Nothing that I didn't already now.
6    Q   Namely, that it's dangerous to go into a
7   confined space --
8    A   Right.
9    Q   -- without a buddy with you or without
10  some inspection saying that the air is okay, isn't
11  it?
12   A   I think what I learned was that the
13  tank testing equipment that they had was not
14  operational.
15   Q   Okay. Well, is the answer to that you
16  just got to air the space out good with fans to
17  make sure it's okay?
18   A   No, you have -- Well, that's one of the
19  things you do, but there's sniffers that we use to
20  test the air in the tanks. And I think Drummond
21  had two or three of them and they were in a cabinet
22  someplace, and none of them were operational. So,
23  I believe -- No, now that you refreshed my memory,

Page 64

1   we talked about it in this thing. Gary Dooley
2   was going to get those pieces of equipment made
3   operational.
4    Q   Gary?
5    A   Dooley.
6    Q   How do you spell his last name?
7    A   D-O-L-L-Y (sic), I believe.
8    Q   Was he an operational guy?
9    A   He was a guy that -- His name's here.
10  He's a guy that went back and forth from Alabama to
11  Colombia on occasion, was a safety guy.
12   Q   All right. But do you think that it was
13  prudent for Drummond to have a safety class on
14  confined space training?
15   A   Yeah, it was after I brought it up, yeah.
16   Q   Okay. So they followed your suggestion,
17  right?
18   A   Yes, sir. Yes, sir.
19   Q   And this was all your idea on the
20  confined space training?
21   A   I think I initially brought it up because
22  I observed on the vessels that maintenance
23  department was going inside some compartments

Page 65

1   without following what I knew was the proper
2   procedure to allow people to go into confined
3   spaces.
4    Q   And did you bring this to Mr. Dooley's
5   attention?
6    A   No, I brought it to Harry Hughes'
7   attention.
8    Q   Who?
9    A   Harry Hughes. He was the maintenance
10  superintendent, because it was his people that were
11  doing it.
12   Q   You had also attended, the next page,
13  Safety: Goals, History and the Future, on January
14  the 3rd of 2001, didn't you?
15   A   Yeah. One hour.
16   Q   Right. Did you find that helpful?
17   A   I don't recall exactly what was there,
18  but I'm sure I did.
19   Q   You can always learn something new, can't
20  you?
21   A   Yes, sir, you can. Never ends.
22   Q   And then look on the first page here, on
23  November 23, 2001, did you attend -- on page 1 of

Page 66

1    Exhibit 4 -- did you attend a coaching session?
2        A   I don't remember what --
3        Q   Coaching for Optimal Performance?
4        A   I don't remember what that was.
5        Q   You are not saying you didn't attend it,
6    you just don't remember?
7        A   No.  I don't remember going to anything
8    for thirty hours.
9        Q   Is that thirty hours or thirty minutes?
10       A   I'm not sure.
11       Q   Okay.  Did you, on this next page -- Turn
12   that over -- do you remember going to any safety
13   meeting at the Hotel Tamaca?
14       A   Yes.  That was what I was talking about,
15   the Dale Carnegie type classes.
16       Q   I see, okay.  So when you put on there
17   the University of the North on your resume, that
18   was not correct?
19       A   Apparently not, no.
20       Q   Okay.
21       A   It was the best of my recollection.
22       Q   Well, you know people on your -- You want
23   to have a good spin on your resume so people will

Page 67

1    hire you, don't you?
2        A   Of course.
3        Q   Okay.
4        A   But it wasn't necessarily a spin as just,
5    you know, what I recalled the content of the course
6    and who were they, the people who were teaching
7    that.
8        Q   Okay.  That's the one that you said that,
9    in Exhibit 4, that your resume specified how many
10   hours?
11       A   It was estimated, ninety hours.
12       Q   Ninety?
13       A   Yeah.  This was -- This was not the only
14   class.  There were several of these that lasted,
15   you know, a lot of time.
16       Q   Long time over several years?
17       A   Over about a year and a half, yeah.
18       Q   Let's go to General Operating -- This is
19   the last document in Exhibit 4, General Operating &
20   Safety Procedure.
21       A   Okay.
22       Q   Part of this has to do with lifting.
23   That's Number 8 on page 1 of Exhibit 4, this

Page 68

1    document.
2        A   I'm on the wrong page, then.  Yeah.  No,
3    I got it, I got it.
4        Q   You got it?
5        A   Yeah.
6        Q   And I want to ask you some questions
7    about that.
8        A   Okay.
9        Q   And I want you to turn to page 4 of that
10   document in Exhibit 4.
11       A   Okay.
12       Q   And in English, the center column says,
13   improper lifting causing back strain.  Do you see
14   that?
15       A   Yes, I do.
16       Q   And the safe job procedure, would you
17   read that?
18       A   Obtaining help when loads are heavy.
19       Q   Do you think that's a good safety rule?
20       A   Yes.
21       Q   Is that a universal safety rule, as far
22   as you know?
23       A   Yes.

Page 69

1        Q   Let's go to page 7 in the center column,
2    hurt/strain back, would you read what's the
3    recommended safe job procedure?
4        A   Lift material properly to prevent
5    strains, use mechanical help when possible.
6        Q   Do you think that is a good, common-sense
7    safety rule?
8        A   Yes.
9        Q   And is that a universal rule for safety
10   so far as you know?
11       A   Yes.
12       Q   Okay.  I'm reading you from Drummond's
13   Safety Program; you understand that?
14       A   Uh-huh.  (Witness indicates
15   affirmatively.)  I understand that.
16       Q   All right.
17       A   I know.  When you'd like me to elaborate
18   on it, I'd be happy to.
19       Q   I understand.  You'll have an opportunity
20   to do that.
21           Page 8?
22       A   Okay.
23       Q   Hurt/strain back, what's the recommended

Page 70

```
1    safe procedure?
2        A   Ask for help when necessary.  Use
3    protective devices such as non-conductive hooks
4    designed for cable handling to reduce bending and
5    lifting.  Use mechanical help such as slings
6    attached to bulldozers as necessary.
7        Q   Do you consider that as a prudent
8    procedure and a safe procedure to follow?
9        A   Yeah, it's pretty general.  Doesn't apply
10   to every situation.
11       Q   Right.  Have you ever used mechanical
12   help such as slings attached to bulldozers?
13       A   Yes.
14       Q   Have you used mechanical help such as
15   slings attached to forklifts?
16       A   Yes.
17       Q   All right.  Let's go to page 9.
18           Strains or sprains.  And what is the
19   recommended procedure, safe procedure?
20       A   Always size up the load, obtain help for
21   heavy objects.
22       Q   Is that a good, safe rule to be used and
23   followed in lifting heavy objects?
```

Page 71

```
1        A   It's a good general rule, yes.
2        Q   And how do you size up the load?
3        A   Go by data plates, look for the weight,
4    look for the size.  See where you have to bring it
5    to, figure out ways to move the load to where --
6    from where it is to where it has to go, and see
7    what kind of cooperation you can get from the
8    people in the area to move the load.
9        Q   All right.  Would that include hefting or
10   trying to lift the object if the weight of it's not
11   shown on any inspection plate or data plate?
12       A   Yeah, kind of.
13       Q   Is heft the right word?
14       A   Yeah, I guess.  I don't know if that's
15   the best description, it's --
16       Q   Obtain help for heavy objects, do you
17   think that's a good rule to follow, good safety
18   rule?
19       A   Depends on how awkward the object is, if
20   there's a way to get a hold of it, or where you
21   have to move it to, if there's room for equipment
22   or people to maneuver.
23       Q   In other words, if it's big enough to get
```

Page 72

```
1    enough people around to lift, it can be manpower
2    help or it can be mechanical help, can't it?
3        A   Right.  As long as you can traverse the
4    area you want to traverse to get the object to.
5        Q   And you agree, then, if -- you need to
6    get help for heavy objects, if necessary?
7        A   Yes.
8        Q   You agree that's a good rule?
9        A   Yeah.
10       Q   All right.  Let's go to the bottom,
11   strains or sprains.  And would you read the correct
12   recommended answer for that?
13       A   The recommended answer is, lift with your
14   legs, not your back; squat down close to the load;
15   keep your back straight and lift slowly.
16       Q   Is that, so far as you know, a universal
17   rule for safely lifting heavy objects?
18       A   Under ideal circumstances, yes.
19       Q   Okay.  And why do you lift with your legs
20   and not your back?
21       A   Because you don't want to bend your back,
22   you want to keep your back straight and use the
23   strength of your legs to lift with.
```

Page 73

```
1        Q   That protects your back?
2        A   It's supposed to, yes.
3        Q   Well, that's what you've been taught all
4    your life, isn't it?
5        A   Pretty much, yeah.
6        Q   All right.  What about, squat down close
7    to the load?
8        A   It's not always possible.
9        Q   But where you can, you should do it?
10       A   Yeah, right.
11       Q   You've been taught that all your life,
12   too, haven't you?
13       A   Pretty much, yeah.  Like I said, this is
14   under ideal circumstances.
15       Q   But they're good general safety
16   principles to follow, are they not?
17       A   In general, yes.
18       Q   All right.  Keep your back straight and
19   lift slowly; is that a good, safe procedure for
20   lifting a heavy object?
21       A   It's a good, general statement, yes.
22       Q   And have you learned that all your life
23   as to what to follow in lifting heavy objects?
```

Page 74

1    A    Yes.
2    Q    Okay.  So far as you know, is that a
3    statement of universal acceptance for lifting heavy
4    objects?
5    A    It's universally accepted, yes.
6    Q    For lifting heavy objects?
7    A    Yeah.
8    Q    All right.  Let's go to page 13, please,
9    sir.
10    A    Okay.
11    Q    At the bottom, excess pressure on discs,
12    possible injury.
13    Q    You want me to read that?
14    Q    Yes, sir.
15    A    Use technique above, parentheses, lifting
16    one corner, can often determine whether weight can
17    be handled by one person.  Obtain help if needed.
18    Q    That goes into the hefting it or testing
19    it for weight, as to whether or not you can do it
20    or you need somebody else to help you do it; is
21    that basically right?
22    A    Yeah, for the most part.
23    Q    And is this a principle that you've

Page 75

1    followed all your adult life as a safe principle to
2    lift heavy objects?
3    A    I try to avoid lifting heavy objects
4    altogether, when I can get somebody else to do it
5    or a piece of equipment to do it.
6    Q    Why is that?
7    A    I just don't feel like doing it.  I know
8    the possibility is there that something can happen.
9    It's just easier to move things with machinery.
10    Q    And were you aware of that when you say
11    you hurt your back in January of 2001?
12    A    Yes.
13    Q    Okay.  So far as you know, were these
14    principles of lifting in effect as part of
15    Drummond's safety program in 2001 when you were
16    employed by Drummond?
17    A    They were part of Drummond's safety
18    program, yeah.
19    Q    And you were aware of these principles?
20    A    Yes.
21    Q    Whether in Drummond's safety program or
22    on your own experience in January 2001, weren't
23    you?

Page 76

1    A    Both.
2    Q    All right.  Let's go to January 25 of
3    2001, the incident that you complain of here.
4    A    Okay.
5    Q    You tell us, tell me what happened,
6    please, sir.
7    A    I got a call from Lloyd McEntire on
8    the radio.  We had port- -- Supervisors all had
9    portable radios, saying the tug was out of service
10    and we needed to get it back into service as
11    quickly as possible.
12         We talked to the tug.  If I recall
13    correctly, I think the tug knew there was already
14    a piece of chain in the propeller.  And the tugs
15    have Kort nozzles where the propeller turns inside
16    of a ring that gives it more thrust, and that's
17    always been a problem at Drummond because the tug's
18    operating in too shallow of water for that type of
19    design.  And there was a chain wedged between the
20    outside diameter of the propeller blade and the
21    inside diameter of the Kort nozzle.
22    Q    Did you talk to the tug yourself?
23    A    Yes.  Talked to him on the radio.

Page 77

1    Q    And what tug was it?
2    A    I believe it was the EL CID.
3    Q    Who was the captain of it?
4    A    I don't remember what his name is.
5    Q    Could he speak English?
6    A    No. I was getting this information
7    through -- I was getting this information through
8    one of my Colombian supervisors who translated it
9    for me.
10    Q    So you couldn't speak enough Spanish and
11    he couldn't speak enough English, so you had to
12    have it translated by a Colombian?
13    A    Right, by one of the Colombian
14    supervisors.
15    Q    And who was that?
16    A    I don't recall which one it was.  There
17    was four or five of them on my crew that, you know,
18    hung out with me and translated.
19    Q    On your crew, what do you mean by that?
20    A    I had sixty-five people in my crew.
21    Q    So, the entire people working the shift?
22    A    In the marina, in the marina.  Four tugs,
23    two crew boats, four cranes and nineteen coal

Page 78

1  barges, that was the equipment I was responsible
2  for operating, and responsible for the people and,
3  you know, talking back and forth through the pier
4  for loading.
5      Q   And was there anybody over you in this
6  responsibility?
7      A   Me and I think at the time was Jose Luis
8  Velasquez, I think he was in there with me.  He was
9  a senior Colombian supervisor.  He was pretty much
10  the guy in charge, since I was fairly new then.
11      Q   Okay.  So your boss on the ground -- or
12  we'll say on the water, so to speak --
13      A   Yeah.
14      Q   -- was Velasquez?
15      A   Velasquez.
16      Q   Velasquez?
17      A   Yeah, he wasn't really my boss.  We were
18  like parallel positions.
19      Q   Equal positions?
20      A   Yeah, similar, yeah.  He was considered
21  senior to me, since he could speak the language and
22  I couldn't.
23      Q   Where were you when you got this call

Page 79

1  from McEntire?
2      A   I was out on the crane, I think, COLOMBIA
3  3, I believe.
4      Q   COLOMBIA 3 or 4?
5      A   I think it was COLOMBIA 3.  I'm not sure
6  exactly.  We had just got there and just turned
7  right around and went back in.
8      Q   How did you get back to shore from the
9  COLOMBIA 3?
10      A   On -- I think on the EVITA.
11      Q   And the EVITA was a crew boat?
12      A   Yes, small crew boat.
13      Q   Thirty-four feet -- thirty, forty feet?
14      A   Yeah, something like that.  It's not very
15  big.
16      Q   Between forty and forty-five feet?
17      A   Yeah, something like that.
18      Q   Typical flush deck and you go below, the
19  crew goes below?
20      A   Yeah.  Used to -- Used to be a flush
21  deck.
22      Q   Okay.  It's not a flush deck now?
23      A   No, they put -- they welded handrails

Page 80

1  on it.  That was a part of the problem we had.
2  This was a hydraulic unit, and the handrails were
3  fixed, and we had to lift it over.  You couldn't --
4  couldn't move cargo on the back deck without going
5  over some aluminum handrails that were fairly
6  substantial.
7      Q   Well, it's not intended to be a cargo
8  boat, it's intended to be a crew boat, isn't it?
9      A   Well, actually it was intended to be
10  both, because that's what it was used for.
11      Q   A supply vessel is what you'd move cargo
12  with, is it not?
13      A   No, sir, not -- not in this instance.
14  Cargo was routinely carried out to the cranes by
15  both crew boats.
16      Q   So, you went back to shore on the EVITA,
17  right?
18      A   Right.
19      Q   And did you get off on the short pier or
20  the long pier?
21      A   Short pier.  Long pier was tied up.
22      Q   In what manner?
23      A   Harry Hughes had one of the crane

Page 81

1  barges there, I don't recall which one, doing some
2  maintenance on it.  And he had all the equipment
3  tied up at the end of the pier, the crane on the
4  end of the pier and everything else down there.
5      Q   So there was a crane on the end of the
6  pier?
7      A   Doing maintenance.  It had some kind of
8  maintenance they were performing on it.
9      Q   And this was a National crane?
10      A   I don't know what the brand was, one of
11  the COLOMBIA 1, 2, 3 or 4.  I don't know what the
12  brands were.
13      Q   All right.  Was that a ten-ton or
14  fifteen-ton lift?
15      A   What, the barge -- the crane barges?
16      Q   No, the crane itself at the end of the
17  pier.
18      A   Oh, I don't recall what the capacity was.
19      Q   But it was capable of lifting this hydro
20  unit, wasn't it?
21      A   Right, except they wouldn't let me use
22  it.
23      Q   Who wouldn't?

Page 82

1    A   Harry Hughes.
2    Q   Why?
3    A   Because he was doing maintenance at
4    the end of the pier.  There was a constant battle
5    between maintenance and marine operations over who
6    had the use of the equipment at the end of the
7    pier, and if maintenance was there, they wouldn't
8    never relinquish any of their equipment.
9    Q   So, you're saying Harry Hughes refused
10   your request to use the crane at the end of the
11   pier to lift this unit; is that your testimony?
12   A   That's correct.
13   Q   Did you ask him personally, face-to-face?
14   A   Yes, I did.
15   Q   Over the radio?
16   A   No, I saw him face-to-face.
17   Q   You went down to the end of the pier?
18   A   No, I went down to where the offices are,
19   and Lloyd McEntire and Harry Hughes had adjacent
20   offices.
21   Q   Did you complain to Mr. McEntire that you
22   couldn't use this crane?
23   A   Yes.

Page 83

1    Q   And what did McEntire say?
2    A   McEntire said, get the damn tug back in
3    service, we can't load without it.  Do whatever you
4    got to do to get it back in service.
5        I said, well, can't we wait until we can
6    use the crane?  He said, no, I need to get that tug
7    back in service as soon as possible.
8    Q   So was McEntire Hughes' boss, or were
9    they coequal?
10   A   They were coequal for the most part.
11   McEntire ran marine operations, and Harry Hughes
12   ran maintenance in the port, shore and offshore.
13   Q   And you wanted to wait until the crane at
14   the end of the pier was available, right?
15   A   Yes, I did.
16   Q   Did you know how much this hydro unit
17   weighed?
18   A   I estimated it weighed about four hundred
19   pounds.
20   Q   Had you used it before?
21   A   No, I hadn't.
22   Q   That was just by looking at it?
23   A   Yeah, that was just, you know,

Page 84

1    guesstimate.  It had a -- You know, it was a
2    wheeled hydraulic unit, except the tires were flat.
3    We tried to put air in them, and they wouldn't hold
4    air.  And they were on my case wanting me to get
5    the thing down there and get the chain cut out so
6    the tug could go back to work.
7    Q   Okay.  Did you have a compressed air
8    tank that you tried to pump them up with?
9    A   Yeah, it was stored back in the vehicle
10   maintenance, and they had air there.  We tried to
11   put air in the tires, and the tires wouldn't hold
12   air, couldn't get a tire to hold.  I'm not sure
13   if they were tubeless or if they had tubes, but
14   anyway, they wouldn't hold air.  So it wouldn't
15   roll like it was supposed to.
16   Q   All right.  Who did you get to help you
17   move this four-hundred-pound unit, you estimate?
18   A   We had -- We had the marine operations
19   pickup truck which was a small Toyota -- I think
20   it was a Toyota pickup, you know, not a full-size
21   pickup up but a small one.  The hydraulic unit had
22   the hoses that were with it and the underwater
23   cutter tied on top of it.  And when we were in the

Page 85

1    maintenance facility, we had the forklift put it in
2    the back of the truck.
3    Q   What did the hose and the cutter weigh?
4        THE WITNESS:  You got that paper that I
5    gave you?
6        BY MR. HILLEREN:  Somewhere.
7        THE WITNESS:  I did an estimate.
8        BY MR. HILLEREN:  I think I saw it in the
9    documents, too.
10       THE WITNESS:  The hose --
11       BY MR. LANKFORD:  It's right here.
12       BY MR. HILLEREN:  Oh, okay.
13       THE WITNESS:  This is an estimate I
14   did.  I estimated it weighed four hundred pounds
15   when I initially saw it, but after I saw the
16   specifications on it and looked at the capacity
17   of the reservoir and approximately what the
18   hoses weighed and saw -- My estimate based upon
19   this information came up to about three hundred
20   thirty pounds.  But my visual estimate, I guessed
21   around four hundred pounds.
22   Q   (BY MR. LANKFORD:)  The hose weighed how
23   much?

22 (Pages 82 to 85)

Page 86

1    A   I think it was twenty foot of hose,
2  twenty, twenty-five feet of hose.
3    Q   And that would weigh how much?
4    A   I don't know.  What did I put?
5    Q   Whatever, whatever you've said on there.
6    A   I put coiled-up hose on top of the unit,
7  estimated weight, fifty pounds.
8    Q   The cutter, how much did it weigh?
9    A   Not that much, maybe ten or fifteen
10 pounds.
11   Q   All right.  Who ran the forklift truck?
12   A   One of the guys from maintenance, I don't
13 know his name.  There was a bunch of them around
14 there, and I just hollered at one of them.
15 Hollered at one of them in Spanglish and pointed at
16 the forklift, and they came over there and picked
17 it up for me.
18   Q   All right.  Did you recruit any divers to
19 go with you?
20   A   Just Mero Mero.  I think he was the only
21 diver I had available that shift, for some reason.
22 Usually we had two Colombian divers on each shift,
23 each crew, but I think he was the only one

Page 87

1  available.
2    Q   All right.  And did y'all get -- Did you
3  go down in the truck, all of you together, or just
4  walk to the end of the short pier, or what?
5    A   We drove -- Well, me and Mero Mero drove
6  to the end of the pier, to the wooden pier.  You
7  have to understand that from where the hard packed
8  road ends to the wooden pier is beach sand.  It's
9  kind of soft, and it's difficult to get the truck
10 that distance to the end of the wooden pier,
11 especially when it's heavily loaded.
12   Q   And how many feet are we talking about?
13   A   Guessing, maybe sixty, seventy feet.
14   Q   So you had a space of sixty or seventy
15 feet to get --
16   A   We got it -- We got it reasonably close
17 to the wooden pier, but not as close as we'd like
18 it to be.
19   Q   Okay.
20   A   We backed it down to the pier.  Tried to
21 get a cherry picker, front-end loader down to the
22 end of the pier, the wooden pier, to offload it for
23 us, but nothing was available.  They were all doing

Page 88

1  things.
2    Q   Who did you try to get that from?
3    A   I think I talked to the -- one of the
4  Colombian guys that was in the yard.  They had
5  two or three cherry pickers -- I mean, not cherry
6  pickers, front end loaders that they used when they
7  unloaded the coal and staged it in the yard, but
8  they were busy, they wouldn't turn it loose.
9    Q   When you said you tried to get a cherry
10 picker, you meant a front end loader?
11   A   Front end loader, yeah, I'm talking about
12 a front end loader.  But the front end loaders were
13 always tied up, tied up or broke.
14   Q   And what would you have used that for?
15   A   To lift the hydraulic unit off the truck,
16 set it on the end of the wooden pier.  But nothing
17 was available, so we had to do it by hand.
18      Keep in mind that all the time this is
19 going on, Lloyd's calling me on the radio every few
20 minutes wanting to know what's going on, when's it
21 going to be finished.  When's that tug going to be
22 back in operation?
23   Q   Every how long?

Page 89

1    A   Every ten, fifteen minutes, for sure.
2
3      (Whereupon, Defendants' Exhibit 5 was marked
4      for identification and copy of same is
5      attached hereto.)
6
7    Q   (BY MR. LANKFORD:)  Okay.  Let me show
8  you Exhibit 5 and ask you if this is the hydro unit
9  and a manual, a manual on which appears your
10 handwriting on the last page?
11   A   Okay.  Yeah, that looks like it, little
12 gasoline engine powered -- I mean, think it's
13 gasoline engine.  Yeah, pretty sure.  It's a
14 hydraulic power unit.  Nice unit, actually.  And
15 that looks like it.
16   Q   And what's the function of this unit?
17   A   To provide hydraulic power to whatever
18 piece of equipment you were going to run.  It can
19 run various types of tools with either a supply
20 connection or a return connection and hydraulic
21 fluid.  Powers different kinds of tools, jacks,
22 grinders, saws, whatever kind of tool you have.
23 Nice capacity little unit.

Page 90

1    Q    So you were familiar with the use of the
2  unit?
3    A    Yeah, yeah.
4    Q    But you had never used it before?
5    A    I never used this particular one.
6    Q    Had you used a similar one to it?
7    A    No, no.
8    Q    Down there, you'd never used one down
9  there?
10   A    No.
11   Q    Had you used one other places?
12   A    Not like this, no. Most of the hydraulic
13  power units I've ever used have been really, really
14  large or permanent installations.
15   Q    But you knew the principle of how it
16  worked and so forth?
17   A    Yes, yes.
18   Q    Okay. All right. How did you get the
19  unit off the bed of the truck?
20   A    Two of us got on the ground, two guys
21  were in the truck, and we lifted it up and kind of
22  put one end in the sand and then drove the truck
23  out from under it, dropped the other end down.

Page 91

1    Q    And who was on the sand?
2    A    I don't recall.
3    Q    Were you on the sand?
4    A    I don't remember where I was, whether I
5  was in the truck or on the sand. I was a part of
6  the operation, but I don't remember where I was.
7    Q    Were you helping lift it?
8    A    Yes.
9    Q    Were you senior in command to this
10  lifting crew?
11   A    Yeah, I suppose so.
12   Q    Okay. Well, you said you had, what,
13  sixty-five men under you?
14   A    Yeah, yeah.
15   Q    And were some of these men, the diver, he
16  was --
17   A    One guy was a diver; the other two guys
18  were -- I don't know who they were, they were
19  laborers, so yeah, I would say so.
20   Q    Mero?
21   A    Mero Mero.
22   Q    Mero Mero?
23   A    Yeah, his name's -- his real name's on

Page 92

1  here someplace, Alvero or something. I think I got
2  it here. That was his nickname. Most of their
3  guys went by nicknames because the Americans
4  couldn't pronounce their names.
5    Q    All right. So you were in charge of this
6  operation, right?
7    A    Yes, as directed by Lloyd McEntire.
8    Q    Right. But McEntire wasn't down there
9  telling you everything to do, was he?
10   A    No. He was just on my case about getting
11  this thing done.
12        Mero Mero's real name is Alvero,
13  A-L-V-E-R-O, Melgorejo, M-E-L-G-O-R-E-J-O.
14   Q    Okay.
15   A    And those two, that name and Mero Mero
16  are the same person.
17   Q    Was the driver of the truck one of the
18  four?
19   A    Yeah, it was me.
20   Q    You drove the truck?
21   A    Yeah.
22   Q    And where did the other two guys come
23  from?

Page 93

1    A    I'm not sure. I think they were down
2  around in that area, and I just grabbed them and
3  said, hey. I think they might have been working
4  for maintenance. There was a bunch of maintenance
5  people down there also.
6    Q    Did they drive in the truck with you?
7    A    No.
8    Q    Okay. They walked down?
9    A    They were -- They were already down
10  there.
11   Q    Did you tell them what the procedure was
12  going to be to get it off the bed of the truck and
13  onto the ground?
14   A    I just motioned to them, hey, come here,
15  you know, I need some help. I couldn't speak
16  Spanish they understood. They saw the piece of
17  equipment and knew we needed help. I motioned to
18  them to come over, and they just grabbed ahold of
19  it.
20   Q    You're not sure whether you were on the
21  truck or on the ground?
22   A    I don't recall, I don't recall where I
23  was. I know I was a part of it, but I don't recall

24 (Pages 90 to 93)

Page 94

1  which -- which area I was in.
2     Q   So, was it -- That was that job of taking
3  it off and putting it on the sand, I believe you
4  said?
5     A   Uh-huh. (Witness indicates
6  affirmatively.)
7     Q   All right. What was the next procedure
8  in this?
9     A   To get it down the wooden pier to the
10 EVITA and put it on board the EVITA.
11    Q   And how big a distance was that?
12    A   Probably fifty, sixty feet.
13    Q   And this was in the sand?
14    A   Maybe five feet of it was in the sand.
15 The rest of it was on the wooden pier. What you
16 have to understand is this unit was wider than the
17 wooden pier is, so it was a bit awkward to grab it,
18 lift it, and get it down the wooden pier.
19        Couldn't -- You couldn't just lift up
20 straight and walk alongside of it. You had to kind
21 of be a little in front of it or underneath it,
22 whatever.
23    Q   All right. Did the four of you do that

Page 95

1  task?
2     A   Yes.
3     Q   And was it the same four that took it off
4  the truck?
5     A   Yes.
6     Q   All right. What happened next?
7     A   Well, we got to the end of the wooden
8  pier and we pretty much took a break. That was a
9  substantial task just getting it down there. Then
10 after we rested a few minutes, we had to get it on
11 board the EVITA, which was a little bit of a
12 problem because the handrails on the EVITA are
13 about three foot tall, and they're made out of, I
14 guess two-inch heavy wall aluminum pipe. And
15 across the back cargo deck where we had to put it,
16 the handrails were in the way, so we had to lift it
17 up high enough to get over the handrails.
18    Q   How high were they?
19    A   About approximately three feet tall.
20    Q   Three feet, three feet. Were they joined
21 by a cable?
22    A   No, it was solid, solid pipe.
23    Q   But there wasn't a cable joining the

Page 96

1  stanchions?
2     A   No. The vertical -- vertical members and
3  horizontal members are all welded together.
4     Q   All right. And the purpose of that was
5  to assist the crew in --
6     A   Well, a lot of it, the EVITA didn't
7  have the capacity to carry all the personnel we
8  put on it inside, so some people rode inside, some
9  people rode on the back deck. And they used to
10 stay inside the handrails and lean on the handrail.
11 So when we'd do crew changes, the boat being too
12 small for the crew, some of them would get on board
13 and some of them had to stay outside.
14    Q   Okay. Did you ask -- How many members of
15 the crew were there on the EVITA?
16    A   Two.
17    Q   Captain and?
18    A   Captain and deckhand.
19    Q   You were not a member of the crew of the
20 EVITA?
21    A   No, I wasn't a permanent member of the
22 crew.
23    Q   Were you a temporary member of the crew?

Page 97

1  What did you do as a member of the crew of the
2  EVITA?
3     A   I used the EVITA. The EVITA was at my
4  disposal, the majority of the time, either the
5  EVITA or DELFIN -- DELFIN, which is the other crew
6  boat.
7     Q   You know what I mean by member of the
8  crew.
9     A   Yeah, yeah.
10    Q   You didn't operate the boat?
11    A   No, I didn't, I didn't operate the boat.
12    Q   You were not the deckhand on the EVITA?
13    A   No, no.
14    Q   So, but it was at your disposal?
15    A   Right.
16    Q   Okay. Under your command?
17    A   Yes, sir.
18    Q   So the captain will do whatever you told
19 him to do?
20    A   The captain would go wherever I wanted
21 him to go, when I wasn't arguing with maintenance
22 or port management about usage of the boat. A
23 lot of times that was a problem. We only had two

Page 98

1  boats, and sometimes the port manager wanted a
2  boat, sometimes the maintenance manager wanted a
3  boat, sometimes security wanted a boat, so there
4  was always a -- always a conflict.
5      Q   It was in heavy demand?
6      A   Yes, sir.
7      Q   Okay.  Well, what happened, did the four
8  of you get the unit aboard the stern area of the
9  EVITA?
10     A   We lifted it -- We lifted it up, and we
11  set it on top of the handrail, kind of balanced it,
12  and then two guys went inboard of the handrail
13  where he could get better use -- better purchase on
14  it.  And we moved it across the handrail, still
15  sitting on top of the handrail.  Two guys held it,
16  if I can recall correctly.
17         Two guys held it once we moved it over
18  the handrail, and then the other two guys came
19  around the head of the handrail and grabbed it
20  again, and we set it down on the deck of the EVITA.
21  So it wasn't just a lift and go straight across
22  kind of deal; the handrail was a big obstacle.
23     Q   So the two guys from the outside came in

Page 99

1  while the two guys on the inside had it steady, and
2  then grabbed the outboard corner?
3      A   Yeah.  And then we got it all the way off
4  the handrail and set it on the deck.
5      Q   Okay.  What happened next?
6          Did you hurt yourself at any time that
7  you've talked about so far?
8      A   I mean, I -- I could feel that, you know,
9  it was a lot of work, it was a lot of strain, but I
10  didn't feel, you know, hurting anywhere, you know.
11  But you could tell it was -- you know, we had done
12  some work.
13         I was --
14     Q   Sir?
15     A   I mean, I'm just thinking.  I was -- I
16  was like fifty-five then, I believe, somewhere
17  around there, and the rest of the other three guys
18  were in their twenties.
19     Q   Were they pretty heavy, stocky guys?
20     A   Mero Mero was.  The other two guys were
21  typical Colombians, you know, they were not -- not
22  heavy or skinny.  I don't really even remember that
23  much about the other two guys.  They were pretty

Page 100

1  nondescript.
2          Mero Mero means whale in Spanish.  That
3  was his nickname.  He was a big -- big guy, big fat
4  guy.
5      Q   Did you instruct the captain of the EVITA
6  where to go?
7      A   Yeah.  Told him to go on out to the EL
8  CID, that was the boat that was having problems.
9      Q   So the EL CID was anchored outside, or
10  was it at the tee?
11     A   I'm not sure where it was, I don't
12  remember.  It was either at the tee, or it was on
13  one of the barge mooring buoys, but I don't recall
14  which one it was.  Had to be either place.
15     Q   All right.  Well, let's assume that it
16  was at the tee because that's where some others
17  remember it was.
18     A   Okay.  All right.
19     Q   What happened next?
20     A   Well, we backed the -- backed the EVITA
21  into the stern section of the tug, which made
22  unloading a little bit easier, because there's no
23  handrail all the way around the stern.

Page 101

1      Q   By the tug, you mean the EL CID?
2      A   The EL CID, yeah.
3          And backed it into the side of the stern
4  of the EL CID.  And the captain kept the throttles
5  in reverse and kept the EVITA hard against the EL
6  CID.  And we, all four of us, and essentially the
7  same thing.  We set it on the side of the EL CID,
8  because there was a bulwark we had to go over, and
9  two guys jumped on the deck of the EL CID, slid it
10  across, and the other two guys jumped on the EL CID
11  and we set it on the back deck.
12         BY MR. LANKFORD:  Read that back.
13
14     (Whereupon, the last answer was read back by
15      the Court Reporter.)
16
17     Q   (BY MR. LANKFORD:)  What lift did you
18  have to make for the difference in the bulwark,
19  approximately?
20     A   Not as high, maybe two feet.  I don't
21  recall exactly what it was, but I know it was less.
22     Q   All right.  Did you tell the people
23  involved in it -- Together there were four people

Page 102

1    involved, right?
2       A   Right.
3       Q   Tell me who they were.
4       A   I think one --
5       Q   Besides yourself.
6       A   Me, Mero Mero, and I think two guys on
7    the tug. I don't recall who the two guys were. I
8    know it wasn't the captain.
9       Q   Two guys off of the EL CID?
10      A   Right. Two guys that were part of the
11   crew on the EL CID.
12      Q   Does Blanco mean anything to you, may
13   have been one of those off the EL CID?
14      A   Sounds familiar, but I don't remember.
15   The name sounds familiar.
16      Q   So, did you ever take off the hose and
17   the cutter off of the unit before lifting it?
18      A   No.
19      Q   Wouldn't that have made it lighter?
20      A   Yeah, but they had the wrong connections
21   on it at the time.
22      Q   What do you mean?
23      A   They didn't have quick connects

Page 103

1    with check valves on them. If we would have
2    disconnected it, we would have had a oil spill.
3    It was just hard pipe, that's why we didn't
4    disconnect any of it. It was just coiled up
5    on top of the unit and tied off.
6       Q   So the two crewmen off of the EL CID
7    stayed on the EL CID?
8       A   Uh-huh. (Witness indicates
9    affirmatively.)
10      Q   While you and Mero Mero --
11      A   No, they jumped onto the EVITA and they
12   helped us move it on the bulwark.
13      Q   Okay, okay. So four of you --
14      A   No, there was four people lifting this
15   thing all the time.
16      Q   Okay. Four of you lifted the unit from
17   the EVITA and put it on the bulwark of the EL CID?
18      A   Right.
19      Q   All right. Did you motion the people off
20   of the EL CID to come help you, and -- You were
21   still in charge of the operation?
22      A   No, they just came over. They knew what
23   was required, they just came over to help.

Page 104

1       Q   And you each got on one corner?
2       A   Pretty much, yes. It's not the handiest
3    thing in the world to lift, because if you'll
4    look at the picture, the upper portion of it, the
5    framework is considerably inboard of the outer
6    portion at the bottom. So, you were lifting it
7    sideways and inboard to keep your legs outboard of
8    the unit out here, versus going over the top.
9       Q   Did you ask anybody or order anybody off
10   of the EVITA to help and share this load that you
11   four were sharing?
12      A   There wasn't any more room to grab it.
13   Four people were -- There wasn't room for more than
14   four people to grab it.
15      Q   Okay. What happened next?
16      A   I think you're right, I think it was at
17   the end of the big pier. We went out into the --
18      Q   At the tee?
19      A   Yeah, I think you're right. We were
20   there. We had to go out -- because we had to go
21   out into clear water. I remember we had to go
22   out into clear water so we could see. There wasn't
23   any visibility there, so we went out -- I don't

Page 105

1    know where, but we went out, further out to where
2    the water cleared up a little bit where we had
3    visibility, went out on the one engine.
4       Q   Okay. And so the EL CID was tied up at
5    the tee, in sheltered water, in the lee of the tee?
6       A   Well, I don't know if it was inside or
7    outside.
8       Q   Okay. Was the sea state -- Did the sea
9    state have anything to do with your accident?
10      A   No. No, the sea state -- The sea state
11   there rarely was a problem.
12      Q   So the sea state didn't have anything to
13   do at the time you took it off of the truck and
14   onto the EVITA, either?
15      A   No. I don't think so.
16      Q   Okay. All right. After you got it on
17   the rail -- excuse me, on the bulwark of the EL
18   CID, what happened then?
19      A   Well, after we got it on the main deck
20   of the stern of the EL CID, we left the end of the
21   pier and went out to somewhere, one of the buoys
22   where we had visibility, where we could see
23   underwater.

Page 106

1  Q   All right. Did you indicate to any of
2  the four that you had hurt your back at any time
3  during this operation?
4  A   No. At that time I didn't realize I'd
5  hurt it.
6  BY MR. HILLEREN: You're talking about up
7  to this point, right?
8  THE WITNESS: Up -- Up to that point, I
9  didn't realize my back was hurt.
10  Q   (BY MR. LANKFORD:) Where were the other
11  members of the crew of the EL CID, were they just
12  standing around?
13  A   Up until the time when we had to get
14  underway, yeah. The captain was up on the bridge.
15  I think there was only -- If I'm not mistaken, I
16  think there was only three guys in the crew of
17  the EL CID, the captain, the deckhand, and the
18  engineer.
19  Q   And you had two of them?
20  A   Yeah.
21  Q   You asked -- You motioned for them to
22  come help?
23  A   No, they just came on their own.

Page 107

1  Q   All right. And that still left a
2  deckhand off of the EL CID if you had wanted to ask
3  them to help?
4  A   The EL CID crew was who came over, two of
5  them.
6  Q   Yes, sir.
7  A   The deckhand and the engineer. The
8  captain was on the bridge.
9  Q   I know, but there was a crew of four.
10  That left --
11  A   Okay. I didn't recall how many crew
12  there were.
13  Q   Let's assume that it was.
14  A   Okay.
15  Q   So you had a crewman off the EL CID, and
16  you had the crew of two off of the EVITA available
17  to help?
18  A   No, not off the EVITA. The EVITA was
19  still powered at the time, so the crew was busy.
20  Q   All right. Well, so the captain was
21  butting against it?
22  A   Right.
23  Q   And were there any lines made fast from

Page 108

1  the EVITA?
2  A   Yeah. Right, there was.
3  Q   So that crewman could have helped, that
4  would have been another helper off of the EVITA had
5  you wanted them to help, right?
6  A   Well, you could only get four people
7  around this thing, I don't care how you do it.
8  Only four people would physically fit around it.
9  Q   My point is that there were two other
10  people available had it been big enough to have
11  gotten around?
12  A   Yeah, yeah.
13  Q   Okay.
14  A   The deckhand was busy on the EVITA
15  monitoring the lines, the captain was operating the
16  vessel. The captain on the EL CID was on the
17  bridge, I don't know what he was doing.
18  Q   But lines were already made fast on the
19  EVITA?
20  A   Yeah.
21  Q   Okay. So, and in addition, the EVITA was
22  in reverse keeping there --
23  A   Yeah.

Page 109

1  Q   -- butting the stern against the CID?
2  A   Yeah, trying to keep the distance closed
3  up, compressing the tires and everything else,
4  because there was big tires on the side of the EL
5  CID, tires on the stern of the EVITA, and he was
6  trying to keep the throttles not wide open but, you
7  know, keep the distance, keep the fenders squished
8  up so it would minimize the distance we had to move
9  it.
10  Q   All right. So, you went out to good
11  water where you could see --
12  A   Uh-huh. (Witness indicates
13  affirmatively.)
14  Q   -- on the EL CID. And was that
15  approximately a mile offshore?
16  A   Yeah, maybe. I'm not sure exactly how
17  far it was. They had nineteen buoys in the mooring
18  area for the tugs, and the furtherest buoy out was
19  probably a mile, maybe two miles out.
20  Q   The closest was what?
21  A   Closest was three or four hundred yards,
22  coming into the tee.
23  Q   All right. What happened next?

28 (Pages 106 to 109)

Page 110

1     A   Then we started the hydraulic unit,
2   tested it out, got all the gear ready and made sure
3   everything worked.  The engineer on the tug did
4   that.  He untied the hoses, fired it up and made
5   sure everything ran.  And -- Excuse me -- he
6   dropped it over the side, the cutter.
7       And Mero Mero and I put on our diving
8   equipment and went over the side and underneath
9   to look at, you know, how badly the -- I think
10  it was a chain, was jammed in the propeller.  It
11  was either a chain or a cable, I forget which one
12  it was.  And it was wedged in there pretty good.
13  Then we'd usually go down two at a time and SCUBA,
14  because we had no surface communication or nobody
15  tending us.
16    Q   Buddy system?
17    A   Yeah.  And Mero Mero grabbed the cutter,
18  started working on it, and I pretty much sat on the
19  shaft and watched him.
20    Q   What did he do with it?
21    A   He just cut out the -- cut out the chain,
22  the cable, like I said, whichever it was.  I think
23  we tied a -- I think we tied a line to it when we

Page 111

1   got it cut or got it cut to where we could maybe
2   get it out, and passed it to a deckhand aboard the
3   EVITA and then had a hand on deck that put a strain
4   on it and pulled it out.
5     Q   Did you tie the line to the chain?
6     A   No.
7     Q   Mero Mero did?
8     A   Mero Mero did.
9     Q   What were your activities?
10    A   I was watching him.  Didn't take very
11  long.  I mean, we weren't in the water more than
12  twenty minutes, if we were that long.
13    Q   How did you get over the side, and you
14  had SCUBA gear?
15    A   Yeah.
16    Q   Drummond's SCUBA gear?
17    A   Yes.
18    Q   Was it functioning properly?
19    A   Yes.
20    Q   Did you have flippers on?
21    A   Yes.
22    Q   And your recollection is that the EL CID
23  was at the tee, but you're not sure whether it was

Page 112

1   on the inside or the outside; is that --
2     A   Yeah, I don't remember where it was
3   exactly.  But I'm pretty sure you're right, it was
4   at the tee.
5     Q   You don't know whether it was tied up
6   port side to or starboard side to?
7     A   I think it was tied up port side, I think
8   it was in.  I think it was on the inside tied up
9   port side to one of the crane barges, because the
10  crane barges were on the inside because that's what
11  was tying up all the end of the pier, and then the
12  crane next to the end of the pier.  Because
13  everything was blocked up.
14    Q   So, the EL CID was made fast to the crane
15  barge?
16    A   Yeah, I believe so, yeah.
17    Q   Fore and aft lines, or do you recall?
18    A   I don't recall.  I really don't recall
19  totally how the makeup was, but I think that's what
20  it was.
21    Q   But there was enough room to back the --
22    A   Yeah, there was deep enough water there.
23    Q   -- EVITA into it and to make her fast on

Page 113

1   her stern, then transfer?
2     A   No.  The wooden pier, the water's not
3   deep enough.  It would have been good if we could
4   have done that, but we couldn't back in because
5   the water's too shallow.  It's not even two feet,
6   especially when the tide is out.  Both of the crew
7   boats were constantly tearing up propellers and
8   rudders because of that.
9     Q   Can I get you to just draw a rough sketch
10  of the tee, and where you think the crane barge
11  was, and how the EL CID was made up, as best you
12  can remember?  And this is not an engineering
13  to-scale drawing.
14    A   Okay.  This is the long pier and the
15  conveyor.  I believe the crane barge was right
16  here.
17    Q   If you would, put crane barge in there.
18    A   (Witness complies.)  And I think the --
19  I'm not sure if there was another vessel there or
20  not, there may have -- There may have been another
21  boat there.  I think there was, I think there was
22  either one of the other tugs there, the DELFIN.
23  The DELFIN was always broke, but I believe the EL

29 (Pages 110 to 113)

Page 114

1  CID was like here.
2      Q   All right.
3      A   And I think there was another vessel
4  here, I'm not sure.
5      Q   All right.
6      A   And then the EVITA backed in similar to
7  that.
8      Q   All right.  Put EVITA there.
9          And just put a question mark by that
10 other one that you're not sure what it was.
11         Do you have a compass bearing that you
12 can put in there?
13     A   No.
14     Q   You don't know the direction the tee was
15 to north?
16     A   I think -- think north is this way.
17     Q   All right.
18     A   I'm not sure.  I believe north is that
19 way.
20     Q   All right.
21     A   That's about all.
22     Q   Was there anything on the other side of
23 the tee that you can remember?

Page 115

1      A   Yeah, this is where they loaded -- They
2  were still loading coal barges.
3      Q   All right.  Would you put the barge
4  there?
5      A   Yeah.
6          And this side of the pier, this barge
7  moved up and down, because that's how they load.
8      Q   Okay.  But what about the other side of
9  the tee that's blank?
10     A   Here?
11     Q   Yeah.
12     A   Yeah, we had some junk over here.  There
13 was always one or two barges in, coal barges there
14 for repair.
15     Q   Okay.  Put the coal barges.
16     A   (Witness complies.)
17         I don't recall how many there were.
18 There was one or two, sometimes three there that
19 they were doing repairs on.  They were always in
20 various states of needing repairs.
21     Q   Would you initial and date that, please?
22     A   Okay.
23         (Witness complies.)

Page 116

1          THE WITNESS:  You want me to put on there
2  anything about that I'm not sure if this is the
3  configuration or not?  It probably was, but.
4          BY MR. HILLEREN:  The best of your
5  recollection, and it's not to scale.
6          I'm getting kind of hungry.
7      Q   (BY MR. LANKFORD:)  That's fine.
8      A   Will that work for you?
9      Q   Yes, sir.
10     A   All right.
11         BY MR. LANKFORD:  That's Exhibit 6.
12
13     (Whereupon, Defendants' Exhibit 6 was marked
14     for identification and copy of same is
15     attached hereto.)
16
17     (Whereupon, there was a brief recess had in
18     the deposition.)
19
20     Q   (BY MR. LANKFORD:)  Mr. Mayfield, if at
21 any time you thought that this load was too heavy
22 for you and the three others to carry, you had
23 radio contact with Mr. McEntire, did you not?

Page 117

1      A   Uh-huh.  (Witness indicates
2  affirmatively.)
3      Q   You could have called him and said --
4  Weren't you on good terms with him?
5      A   Yeah.
6      Q   Friends?
7      A   No.
8      Q   Well, but you had a cordial --
9      A   Working -- Working acquaintances.
10     Q   You had a good, cordial relationship,
11 wouldn't you say?
12     A   Yeah, for the most part.
13     Q   Okay.  Did you call him by his first
14 name?
15     A   No.
16     Q   Mr. McEntire, this is just too heavy for
17 us, we're going to have to wait until we get some
18 mechanical help, you're going to have to free that
19 crane up at the end of the tee; you could have done
20 that at any time?
21     A   Did that.
22     Q   You did that?
23     A   Did do that several times.

Page 118

1  Q   How many times did you do that?
2  A   Twice, at least.
3  Q   And what did he tell you?
4  A   He said, we need to get this tug back in
5  service, we need to make tonnage, do whatever you
6  got to do to get it going.
7  Q   All right.  But you recognized that it
8  was going to be heavy, or you wouldn't have called
9  him, didn't you?
10  A   Yeah, right.
11  Q   You could look at it and eyeball it?
12  A   I called -- I talked to him in person
13  when I first went up and went to get the hydraulic
14  unit, told him I think there's a problem.  I said,
15  I've already talked to Harry Hughes, Harry won't
16  give me any help, he won't free up any equipment at
17  the end of the pier.
18  Q   Did you tell him how much you thought
19  this unit weighed?
20  A   He knew what it was.
21  Q   Did you tell him that?
22  A   Yeah.
23  Q   You told him you thought it weighed four

Page 119

1  hundred pounds?
2  A   Yeah.  I told him, I said -- Well, I
3  called him Lloyd and Mr. McEntire, depending.  I
4  told him, I said, Lloyd, this thing is real heavy.
5  I said, you know, we're going to have a problem
6  handling it, getting it down the pier and on the
7  boat and all that.  And I said, Harry won't help
8  us, you know, he won't give us any -- any help at
9  the end of the pier.
10  Q   With the crane?
11  A   Yeah.  And he said, just get it fixed.
12  He said, I got people on my ass wanting this tug
13  back on because tonnage is suffering.
14  Q   All right.
15  A   So, I said, well, I'll do what I can do.
16  Q   So you tried twice to do that?
17  A   Yeah.
18  Q   And was that before you ever lifted it up
19  or during the time, the period that you were
20  fooling with it?
21  A   Before, before and during.
22  Q   And during?
23  A   Yeah.

Page 120

1  Q   After it was on the CID?
2  Excuse me.  After it was on the EVITA?
3  A   Before -- Before it was on the EVITA.
4  Q   You called twice?
5  A   Yeah.
6  Q   Because of its weight that you could
7  feel?
8  A   Yeah.  Yeah, I even called -- What's
9  his -- I can't think of his name, Dan.  He was the
10  maintenance supervisor, I can't think of his last
11  name.  He doesn't work there anymore.  Dan was on
12  the crane barge doing -- doing -- He was in charge
13  of the maintenance on the crane barge.  I went
14  around Harry and called Dan and asked Dan if there
15  was any way, you know, we could get some help
16  loading this thing.
17  And he told me the crane barge was at a
18  point where nothing on there worked because it was
19  disassembled, and Harry didn't want to move the
20  crane barge out the way to let me get the CID in
21  next to the crane on the pier.
22  Q   And is it your testimony that that crane
23  would not reach the EVITA?

Page 121

1  A   No, it won't, not unless they move the
2  crane barge out of the way, and they wouldn't do
3  it.
4  Q   It was outside the arc of the swing?
5  A   Yeah.  Yeah, it's a small crane; it's not
6  a big crane.
7  Q   And but it's a expandable boom, is it
8  not?
9  A   Yeah, it's a telescoping boom crane.
10  Q   Yeah.  What do you think the length of
11  the boom was?
12  A   I would guess maybe thirty feet.
13  Q   And how far were you outside that arc?
14  A   Well, the crane barge was -- the crane --
15  the crane -- Let me -- Can I draw on this?
16  Q   Sure.
17  A   The crane is in this area somewhere, it's
18  on the pier.
19  Q   All right.
20  A   The crane barge was blocking access to
21  it, and they wouldn't move the crane barge.
22  Q   All right.  Put the crane right there, if
23  that's where it is.

Page 122

```
 1    A   It's, you know.
 2    Q   Approximately.
 3    A   (Witness complies.)
 4    Q   All right.
 5    A   But at Drummond in Colombia at the
 6  port in Santa Marta, there was a constant battle
 7  between maintenance and marine operations. I mean,
 8  constant. Harry Hughes ran maintenance both ashore
 9  and in the marine area, and Harry would not budge.
10  His tasks came first. If you had a problem, he
11  really didn't care. And him and Lloyd were always
12  butting heads.
13    Q   Where is Mr. Hughes now?
14    A   I believe he was terminated.
15    Q   By Drummond?
16    A   Yes.
17    Q   Where is he from?
18    A   I heard him talk about Arizona, Phoenix
19  area, may -- It was either him or the guy that
20  worked for him, I don't recall which one. I think
21  he was from Arizona, though.
22    Q   You mean Dan?
23    A   Dan was the maintenance supervisor. He
```

Page 124

```
 1    A   Uh-huh. (Witness indicates
 2  affirmatively.)
 3    Q   -- if it's too heavy, and you agreed with
 4  all those safety rules?
 5    A   Yeah, except Drummond wasn't following
 6  them.
 7    Q   Well --
 8    A   When I asked for help, help was refused.
 9    Q   Yeah, but --
10    A   When I told the situation, I got my butt
11  chewed out and told to get down there and make it
12  work, I need the tug back.
13    Q   You said you had three strong guys, Mero
14  Mero and two other guys?
15    A   Uh-huh. (Witness indicates
16  affirmatively.)
17    Q   There was a fourth one down there
18  somewhere, if there was some reason for you to feel
19  like that you should not be doing that lifting
20  yourself; isn't that right?
21    A   Yeah.
22    Q   Right?
23    A   But I didn't know where he was.
```

Page 123

```
 1  was like my -- my level, he worked for Harry.
 2    Q   Okay. You've told us about those
 3  efforts. As the supervisor, you could have gotten
 4  somebody younger to help you lift that unit, could
 5  you not?
 6    A   Yeah, that I just had to use the people
 7  that were around me.
 8    Q   Well, if you felt that you were -- I
 9  don't want to say too old, because I'd be talking
10  about myself.
11    A   Yeah, I know what you mean.
12    Q   Big time.
13    A   Yeah.
14    Q   But if you felt it was too much of a load
15  for you, you could have stopped and gotten somebody
16  else, could you not?
17    A   I asked for people, and the only people
18  that were available, they said, just use who's ever
19  down on the beach.
20    Q   Well, but if you, instead of subjecting
21  yourself to a possible injury, one of the rules
22  that we just talked about, safety rules, is get
23  help --
```

Page 125

```
 1    Q   Well, to protect yourself and maybe the
 2  three others helping you, wouldn't it have been
 3  prudent for you to have sought a younger, strong
 4  guy?
 5    A   Yeah, sitting around this table, that'd
 6  be a perfect situation.
 7    Q   Well --
 8    A   But around -- But at the time, the
 9  pressure was on to get this thing back in service.
10  Lloyd was raising hell with me on the radio to get
11  the tug back in service. Harry wasn't giving me
12  any cooperation. The Drummond safety rules went by
13  the wayside because of the way they were running
14  the operation down there, and if I wouldn't have
15  said -- If I wouldn't have cooperated and done what
16  I was told, they'd have put me on the next plane
17  home and fired me.
18    Q   They didn't tell you that. They never
19  have told you --
20    A   No, but it was implied heavily.
21    Q   Who implied that?
22    A   Lloyd.
23    Q   What did he tell you?
```

Page 126

1    A   He told me to get the damn thing back in
2  service, or I'll find somebody that can.
3    Q   Oh. He said, I'll find somebody who can?
4    A   Yeah.
5    Q   Lloyd was relying on you to get this done
6  as the supervisor?
7    A   Right, yeah. I was the guy that was
8  there.
9    Q   You were the head diver and you had a
10  supervisory position?
11    A   Right, yeah.
12    Q   And you told me you were in charge of, I
13  don't know how many people?
14    A   There were sixty-five people on the crew.
15    Q   Sixty-five people on your shift?
16    A   They were all on various vessels
17  throughout the fleet, and all performing jobs.
18    Q   I understand that. But I'm just saying
19  you could, if you had felt insecure or felt it was
20  pulling your back, gotten another person to take
21  your load, perhaps somebody younger?
22    A   Well, at the time that we were doing
23  this, I didn't feel any problems, although I knew I

Page 127

1  was exerting a lot of effort, I didn't feel
2  anything that hurt me.
3    Q   But you knew it was heavy enough because
4  you requested mechanical help two times over the
5  telephone to Lloyd, didn't you?
6    A   And in person, and it was denied.
7    Q   And in person, okay. So, you knew that
8  it was going to be an imposing task?
9    A   Yes, yes.
10    Q   A heavy lift --
11    A   Yes.
12    Q   -- for you to make, and your age then was
13  what, fifty-four?
14    A   Fifty-four or fifty-five, yeah.
15    Q   And how tall are you?
16    A   Six three.
17    Q   And how much do you weigh?
18    A   At the time I weighed about two twenty.
19    Q   And what do you weigh now?
20    A   Two fifty.
21    Q   All right. What was your lifting
22  capacity from experience, working out with weights,
23  however you want to say?

Page 128

1    A   I have no idea.
2    Q   Okay. But my point is, Mr. Mayfield,
3  that if you had felt there was any danger to you
4  because of your age -- I'm not suggesting --
5    A   Yeah, I --
6    Q   I'm not suggesting strength at all.
7    A   That's understood.
8    Q   Because of your age. I'm seventy-seven;
9  I know that I wouldn't try to do anything like
10  that, I'm not that crazy. I'll do some other
11  things, but.
12        And I don't mean to be -- I don't say
13  this in a derogatory way at all. I'm just saying
14  that if you had felt that this was too much for you
15  to try to, to use an old countryman's expression,
16  tote, you could have found somebody younger if you
17  had taken the time to do it?
18    A   Only I wasn't given the time.
19    Q   Okay. But you were in charge of the
20  operation?
21    A   Well, I was in charge of the operation
22  under the behest of Lloyd McEntire.
23    Q   You could have said --

Page 129

1    A   When I tried to seek cooperation, tried
2  to seek assistance, I was denied assistance by
3  Harry Hughes and Lloyd. Lloyd said, just get it
4  done or I'll find somebody that can get it done, I
5  need this tug back in operation because we're not
6  making tonnage.
7    Q   If you had felt genuinely concerned about
8  yourself, you could have bowed your back up and
9  said, Lloyd, I'm just -- I'm afraid I'm going to
10  hurt myself, you need to get somebody else?
11    A   And I'd have been on the next plane out
12  of there, and I needed my job.
13    Q   So you feared for your job; is that
14  right?
15    A   Yeah, that's right.
16    Q   Okay.
17    A   It's just nothing unusual in the kind of
18  work that I've done over the years. Oil field's
19  just like that.
20    Q   You cut the chain out and freed the port
21  wheel of the EL CID. And then you got back on
22  board?
23    A   Uh-huh. (Witness indicates

Page 130

1  affirmatively.)
2      Q   How did you get overboard?
3      A   Climbed down the ladder.
4      Q   Okay. Was there a retractable ladder
5  that fit over the gunwale or something, dive
6  ladder?
7      A   Yeah, a dive ladder with hooks that
8  hooked over the gunwale.
9      Q   Okay. And that was part of the apparel
10  or equipment of the EL CID?
11      A   No, that was diving equipment we brought
12  out with us.
13      Q   What all did you bring, please, sir?
14      A   Two pairs of fins, two SCUBA tanks, and
15  regulators and BC, buoyancy compensators, and two
16  masks, and gloves, swim trunks, wetsuit tops,
17  things like that.
18      Q   So you had on a wetsuit top?
19      A   I'm not sure if I did or not. I didn't
20  always wear it. Most of the time, I just wore my
21  swim trunks.
22      Q   So you went back aboard the EL CID, and
23  then the CID took you back to where, the tee, or it

Page 131

1  took you to the little short pier?
2      A   I think -- I think I rode the EVITA back
3  in.
4      Q   Okay.
5      A   CID couldn't get to the short pier.
6  Water's too shallow.
7      Q   All right. To the short pier?
8      A   Yeah, to the wooden pier. We used to --
9  That was the name we gave it, the wooden pier.
10      Q   Wooden pier. But that is the short pier?
11      A   Yeah.
12      Q   And did you take your diving gear off the
13  vessel?
14      A   No, I didn't -- I didn't carry anything
15  after that.
16      Q   Well, did you experience pain?
17      A   Yeah, when --
18      Q   When was that?
19      A   When we came out of the water and after I
20  had hosed off and I was changing clothes, putting
21  my work clothes back on, I was kind of bent over
22  trying to put my socks on, and something went out
23  in my back and dropped me down to my knees. And

Page 132

1  the guys had to help me up.
2      Q   Who helped you up, Mero Mero?
3      A   I think he was one of them, and one of
4  the deckhands. And then I just kind of hung onto
5  the ladder and tried to straighten up, and it was
6  hurting real bad. And I don't know what happened
7  after that as far as equipment went, but I know I
8  went in on the crew boat and they brought me in to
9  see Dr. Garcia.
10      Q   Okay. How did they get the unit off of
11  the EVITA -- or it was on the, excuse me, the EL
12  CID, wasn't it?
13      A   Yeah. I think they got it back off the
14  same way they put it on, but I didn't have anything
15  to do with unloading it.
16      Q   Well, did they get it off while you were
17  there?
18      A   I'm not sure, I don't remember. I don't
19  think so. They may have, but I don't think so. I
20  know I didn't lift any more after that.
21      Q   You're the supervisor, you didn't have to
22  lift anything, did you?
23      A   Probably not.

Page 133

1      Q   Okay. That's why you had sixty-five men
2  under you, to do your lifting, isn't it?
3      A   Well --
4      Q   In theory, anyway?
5      A   Yeah, in theory, yeah.
6      Q   Okay.
7      A   Just wouldn't have got done if I wouldn't
8  have done it, that's all.
9      Q   About how long did it take you to take
10  the unit off the truck and put it on the EVITA,
11  please, sir, approximately?
12      A   Twenty minutes.
13      Q   And how long did it take you to transfer
14  it from the EVITA to the EL CID?
15      A   Probably from the time we left the end of
16  the pier to get to the EL CID, maybe another
17  twenty, twenty-five minutes.
18      Q   Actual lifting time, less than five
19  minutes each place, actual lifting?
20      A   Probably a little longer at the wooden
21  pier, but I don't know what the time would be,
22  because we spent a lot of time balancing it on
23  handrails and bulwarks.

Page 134

1    Q    And so you went to see Dr. Garcia, and
2  how long were you out of commission?
3    A    For the rest of that tour.
4    Q    And that was how long?
5    A    I don't -- don't remember.  It was a
6  two-week tour.  I'm not sure where I was in that
7  tour.  It was on the day shift, so it couldn't
8  have been more than a week, because we started out
9  the first week at night and the second week in the
10  day.
11    Q    And you were two weeks on and one week
12  off?
13    A    Right.
14    Q    Twelve-hour shifts?
15    A    Yeah.
16    Q    What hours generally, 6:00 to --
17    A    6:00 to 6:00.  You work 6:00 at night to
18  6:00 in the morning, then when you switch from
19  night shift to day shift, you get twenty-four hours
20  off and then made the transition from night to day,
21  and you work from 6:00 in the morning to 6:00 in
22  the evening.
23

Page 135

1    (Whereupon, Defendants' Exhibit 7 was marked
2      for identification and copy of same is
3      attached hereto.)
4
5    Q    (BY MR. LANKFORD:)  Mr. Mayfield, I show
6  you Exhibit 7, which appears to be an accident
7  report?
8    A    Uh-huh.  (Witness indicates
9  affirmatively.)
10    Q    And is that in your handwriting?
11    A    Yes.
12    Q    And is that Mr. --
13    A    Everything but this where it says, Case
14  ID, that's not my handwriting, and this part up on
15  top's not.
16    Q    Okay.  All right.
17    A    Lloyd, the super- --
18    Q    Is that Lloyd McEntire's signature?
19    A    Yes.
20    Q    Did you submit to him this accident
21  report?
22    A    Yes.
23    Q    The same day it happened?

Page 136

1    A    I believe it was the same day, might have
2  been the next day.
3    Q    I notice that you put -- have the date of
4  the accident, it looks like somebody's put a five
5  over a four.  Do you notice that?
6    A    Yeah, I see somebody wrote something
7  somewhere.
8    Q    Well, did you do that?
9    A    Somebody's initials under it, looks like
10  Lloyd's.
11    Q    Are we looking at the same thing?
12    A    Yeah, where --
13    Q    Right here?
14    A    Somebody initialed it underneath it.  It
15  looks like Lloyd's initials.  Either that, or I --
16    Q    No, I did that.  I beg your pardon, just
17  that as part of my own records.  It just was to
18  help me identify that that looked like a mark-over.
19      Does it look like a five put on top of a
20  four?
21    A    There's a five for sure, but I don't know
22  what was under it.
23    Q    All right.  And this says that you had

Page 137

1  had -- you were a diving officer?
2    A    Yeah, that's what Lloyd called me.
3    Q    Well, that's what you put, wasn't it?
4    A    Yeah, that's -- that was the designation
5  Lloyd gave me.  Because I asked him what to put
6  there, and he said, put diving officer.
7    Q    And marine superintendent, that's what
8  your job was?
9    A    Yeah.
10    Q    Did Mr. --
11    A    McEntire was the superintendent; I was a
12  supervisor.
13    Q    Oh, you were a marine supervisor, okay,
14  instead of superintendent.
15    A    Yeah.
16    Q    And the rest of it is your handwriting,
17  except for Mr. McEntire's signature?
18    A    Right.
19    Q    Now, you said experience at the location
20  was four months.  Is that right?
21    A    Yeah, it was four months at Drummond in
22  Colombia.
23    Q    I thought you told me you went to work

Page 138

1  for Drummond in Colombia in 1999 of October?
2      A   I did say that.  Maybe I was wrong
3  writing it on there.
4      Q   Your employment contract gives that date,
5  that's the reason I --
6      A   Uh-huh.  (Witness indicates
7  affirmatively.)  Well, I may have been mistaken on
8  that, then.
9      Q   That --
10     A   I thought it was '99, though.
11     Q   I beg your pardon?
12     A   I said, I thought I started there in '99.
13  Maybe it was 2000.  What's my resume say?
14          I know, look at the -- that disk I gave
15  you, it's got my tax return on there for 2001.
16  That'll give you the starting date.
17     Q   Okay.  Well --
18     A   I believe it will, now.
19     Q   I'm not sure of that.
20     A   I've got -- And I've got a letter.  Have
21  you got that offer letter?
22     Q   It's in there somewhere, but.
23     A   Yeah, the offer letter is --

Page 139

1      Q   That never was signed.
2      A   Huh?
3      Q   That never was signed.
4      A   That was e-mailed to me.
5      Q   That I could find, anyway.
6      A   Yeah.  The offer letter should have a
7  date somewhere around there.
8          BY MR. HILLEREN:  I've got something
9  here.  Let's see.  No, that's -- Let's see.
10         THE WITNESS:  Well, apparently it was
11  '99.  This is dated 11-13-01 when they were talking
12  about relocating me to Houston from J.A. Milsak,
13  said I made a request of him this past summer and
14  didn't personally negotiate the employment package,
15  I contacted Ron Richardson who with my consensus
16  agreed to extend the relocation till then.
17     Q   (BY MR. LANKFORD:)  What are you reading
18  from?
19         BY MR. HILLEREN:  Okay.  These are three
20  pages, I guess of e-mails.  I made a copy for you.
21         THE WITNESS:  They were talking about --
22  Actually they were talking about relocating me up
23  until March of 2002.  They were going to pay for me

Page 140

1  to relocate to Birmingham area.
2          BY MR. LANKFORD:  This is the stuff
3  you're supplementing your production; is this what
4  you're talking about?
5          BY MR. HILLEREN:  That's right, that's
6  right.
7      Q   (BY MR. LANKFORD:)  Well, let me ask you
8  a question about the last exhibit.
9          This said, you have in there that it
10  requires four people.  What did you mean by that?
11     A   I don't know, I don't remember.  I wanted
12  to write more, write a supplemental page on this,
13  and Lloyd said just put on here what'll fit in that
14  space and he didn't want a supplemental page.
15     Q   What did you want to add?
16     A   I wanted to give a better description of
17  the events that had taken place, and I asked Lloyd
18  if I could write a supplemental page.  And he said,
19  no, the space you have on this form is all I want
20  you to fill out.  He said, I don't want to get
21  involved with any supplemental pages.
22     Q   You said it requires four people.  Well,
23  you had four people?

Page 141

1      A   Yeah, I know I did.
2      Q   Okay.  I'm asking you, if you had four,
3  why did you put that in there?
4      A   I don't remember why I put that on there.
5
6      (Whereupon, Defendants' Exhibit 10 was marked
7       for identification and copy of same is
8       attached hereto.)
9
10     Q   (BY MR. LANKFORD:)  All right.  Here's
11  Exhibit 10, which appears to be a version of the
12  same incident.
13     A   I don't know.  It is similar.
14     Q   That's your handwriting?
15     A   Yes.
16     Q   That's your signature?
17     A   Yes.
18     Q   Again, you said it, quote, it takes four
19  people to handle the unit for loading or unloading?
20     A   I don't know.
21     Q   You had four people?
22     A   Yeah, I know I did.
23     Q   So you don't have any explan- --

Page 142

1    A   I don't recall why I wrote it that way,
2  might have been something in the conversation Lloyd
3  and I had while I was filling that out. Because I
4  spent the rest of that tour in my room on my back,
5  and Lloyd just called me up, wanted me to come to
6  his office and fill this out in front of him.
7
8        (Whereupon, Defendants' Exhibit 11 was marked
9        for identification and copy of same is
10       attached hereto.)
11
12    Q   (BY MR. LANKFORD:) Show you Exhibit 11,
13  and ask you if that's not a picture of the crane
14  we've been talking about?
15    A   Yes, it is.
16       And the second picture has pretty much
17  the same situation I described. I don't know which
18  one it is, but -- Yeah, I do, too. It's COLOMBIA
19  4. COLOMBIA 4 blocking the access to the crane.
20       Because I had them build these winch
21  guards when I was out there.
22    Q   Do what?
23    A   These yellow guards, cable guard for the

Page 143

1  winch, they didn't have any when I went out there,
2  and I had my guys fabricate them and install them.
3    Q   Who are your guys?
4    A   The crew on the crane, my crew, you know,
5  C Crew.
6    Q   Were you assigned primarily to Crane
7  Number 4?
8    A   No, I was assigned to all the cranes.
9
10       (Whereupon, Defendants' Exhibit 8 was marked
11       for identification and copy of same is
12       attached hereto.)
13
14    Q   (BY MR. LANKFORD:) All right. Let me
15  show you Defendants' Exhibit 8 and ask you to look
16  at that, too, please?
17    A   Okay.
18       Yeah. What about it?
19    Q   That first one, the short pier would have
20  been the wooden pier we've been talking about?
21    A   Uh-huh. (Witness indicates
22  affirmatively.)
23    Q   All right.

Page 144

1    A   Yeah, it's been glorified a little bit.
2  All of this stuff around both sides of it with the
3  line and all that, that must have been put there
4  for your benefit, because that was never there.
5    Q   What stuff?
6    A   The stanchions and the rope and all that
7  kind of stuff.
8    Q   Okay.
9    A   And the pier looks like it's longer than
10  it used to be. I think they made the -- they made
11  the pier a little longer, and they made it wider
12  while they were at it, because it's wider than it
13  used to be, also.
14       The second picture, if you'll look,
15  that's the handrails I was speaking of.
16    Q   Of the EVITA?
17    A   Yes, sir.
18    Q   Okay.
19    A   And you'll notice the only open space to
20  the main deck is through the slot in the back.
21    Q   Okay.
22    A   And this is a picture of the EL CID, and
23  he's on the outside of the tee pushing against the

Page 145

1  coal barge while they're loading a coal barge. And
2  that's the bulwark we had to lift up over.
3    Q   Okay.
4    A   And it was in between the line guard,
5  towing guard, and the aft part of the
6  superstructure.
7       And there's the mighty EVITA. They
8  changed it.
9    Q   Sir?
10    A   This picture's changed from the way it
11  used to operate. They put the mufflers up on main
12  deck, dry muffler. Used to be --
13    Q   On the EL CID?
14    A   On the EVITA.
15    Q   On the EVITA?
16    A   Yeah, that's not exactly the same.
17    Q   In what way?
18    A   The mufflers are on deck, coming out of
19  the engine room on deck, rather than making a water
20  exit through the stern. So that must have been
21  something they did after I left.
22    Q   Okay. Here, this appears to be an e-mail
23  from Toi Corbett to you --

Page 146

1    A    From who?
2    Q    -- dated February 9, 2001.
3    A    Received your accident report and
4    medical -- I don't know. I don't know what that's
5    about. Medical records were Dr. Garcia and the
6    guy in -- the guy in Birmingham that did the
7    examination and did the --
8    Q    Grabowski?
9    A    Yeah, Grabowski. All she wanted was
10   the -- I told her -- sent her back, I said, just
11   e-mail and fax me the English version of the
12   doctor's report.
13   Q    Okay. Well, who is she with CGH
14   Insurance Company?
15   A    I guess that's Drummond's insurance. I
16   vaguely remember this, and I talked to her on the
17   phone after I got the e-mail and what she wanted
18   was the English copy of the doctor's report.
19   Q    Okay. So --
20   A    Or I wanted it, either one of them, I
21   don't know which one it was.
22   Q    Okay. But it was translated for
23   somebody, anyway?

Page 147

1    A    Yeah, yeah, yeah. Somebody, for
2    somebody, I'm not sure.
3    Q    Okay. All right. You were treated by
4    Dr. Garcia. Was your treatment satisfactory, as
5    far as you know?
6    A    Yeah, he put me to bed, gave me some
7    pills, told me to stay in bed the rest of the
8    rotation. I asked him if he thought I should go
9    to another doctor. And he said, well, you need to
10   go -- when you get to the States, he said, go get
11   examined by the -- by a doctor in the States.
12   Q    Okay.
13   A    And Jaime Daza, who was the safety guy,
14   Jaime didn't want to list this as a lost-time
15   accident, which he never did. He didn't like any
16   kind of lost-time accident because it made him look
17   bad. So I just pretty much stayed in bed till the
18   plane left to go back to the States.
19   BY MR. HILLEREN: Do you know what day of
20   the week the accident happened on?
21   BY MR. LANKFORD: I don't know. I might
22   be able to reconstruct it, let me see.
23   Q    (BY MR. LANKFORD:) You've got a daily

Page 148

1    log yourself that starts in December of 2000. This
2    was January 25, huh?
3    A    Yeah.
4    Q    I'm looking at your own diary.
5    A    Yeah, that's fine.
6    Q    Which says Thursday the 25th.
7    A    Oh, okay. Well, the next day the plane
8    was leaving to go back to the States, then.
9    Q    And you got on it?
10   A    Yeah. Because you flew on -- The marine
11   operations flew on Friday, and I was on the day
12   shift so it had to be the end of my rotation.
13   Q    What did I say, Thursday? Yeah, Friday
14   you got out, yeah. Friday was the 26th.
15        So you were down there about twenty-four
16   hours in bed and whatever?
17   A    Yeah, yeah.
18   Q    Did it leave the next morning?
19   A    Yeah.
20   Q    Okay. So --
21   A    Yeah. Yeah, they have to get you from
22   the port to Santa Marta Airport, and from Santa
23   Marta Airport -- Well, you've been down there,

Page 149

1    obviously.
2        BY MR. LANKFORD: No, I haven't.
3        This is off the record.
4
5    (Whereupon, a discussion was had off the
6    record.)
7
8    Q    (BY MR. LANKFORD:) I asked you a little
9    bit about special projects, I believe, that Lloyd,
10   Mr. McEntire had you do.
11   A    Yeah.
12   Q    And let me see something here.
13        And the first one that comes is a
14   freshwater system, bilge, ballast and fire main.
15   A    Uh-huh. (Witness indicates
16   affirmatively.)
17        That was, what, COLOMBIA 4?
18   Q    I don't know, I was going to ask you.
19   A    I think it is.
20
21   (Whereupon, Defendants' Exhibit 12 was marked
22   for identification and copy of same is
23   attached hereto.)

Page 150

1    Q   (BY MR. LANKFORD:) I show you Exhibit
2  12, which seems to be dealing with fire mains and
3  all that?
4    A   Yeah, I think that's COLOMBIA 4.  Yeah,
5  it is COLOMBIA 4.  Actually these are all -- these
6  are existing construction documents.
7    Q   Oh, I see.  So this is not your work, you
8  just took existing --
9    A   I didn't do anything with it.  I mean,
10  I went down, as part of my duties onboard the
11  vessel, onboard all the vessels, and made sure
12  that all the valves were identified that were
13  indicated on the drawings, on the new construction
14  drawings.
15    Q   So, this wasn't your drawing, it's dated
16  13 of --
17    A   No, this was when they built COLOMBIA
18  4.  They have all these valves identified by
19  number, and all he wanted me to do as part of
20  my operational responsibilities within the fleet
21  was to verify that all the valves were tagged so
22  that we could post these on the bulletin boards on
23  COLOMBIA 4, so the guys that worked in engineering

Page 151

1  would be able to refer to them.  And then they
2  translated this into Spanish.
3    Q   Did you verify that they were tagged?
4    A   Yeah.
5    Q   And did Drummond post the tags in the --
6    A   They -- Over this manifold assembly --
7    Q   Yeah.
8    A   -- they put a bulletin board under glass,
9  and they translated all this into Spanish, so
10  anybody, American or Colombian, would be able to
11  read them and understand how to line up the valves
12  to perform different tasks.
13    Q   All right.  And this was a task that
14  Mr. McEntire gave you?
15    A   Yeah, that was part of my normal duties.
16  He knew I had worked in, you know, the engine room
17  on ships before and I could understand the
18  drawings.
19         Gary Sloan and I think his name's Roy,
20  both of those guys are coal mining -- land-based,
21  coal mining guys that they turned into mariners,
22  and they weren't as well versed in this as I was.
23  So, he asked me to do that for him.  This took --

Page 152

1  This took a couple of hours.
2    Q   Couple of hours?
3    A   Yeah.
4
5      (Whereupon, Defendants' Exhibit 9 was marked
6       for identification and copy of same is
7       attached hereto.)
8
9    Q   (BY MR. LANKFORD:)  All right.  I show
10  you Exhibit 9, which seems to be a memo from you to
11  Sloan and to McEntire, dated December 14, 2000.
12  This goes to the buoy system?
13    A   Yeah.
14         Yeah, this was -- Lloyd wanted to know
15  if I could find out all the construction details
16  and the bill of material on all the buoys in the
17  anchorage systems, because it was scattered all the
18  way -- all over the place through several file
19  cabinets in two offices.  So what I did was I went
20  around and found the documents, and correlated
21  them, and put them in one package.  And then I
22  wrote the bill of material based upon what I found.
23    Q   You wrote what?

Page 153

1    A   I wrote this -- This is, you know, is a
2  preliminary bill of material.  I wrote the bill of
3  material based upon documents that I found.  This
4  wasn't a real big project; it's just they didn't
5  know where to look or how to look.  They didn't
6  have a clue how to research something like this.
7    Q   All right.  How long did that task take
8  you?
9    A   About four hours.
10    Q   It was ashore, work done ashore?
11    A   Yeah, that was before I went out on the
12  shift.
13    Q   Before you went out on what?
14    A   Before I went out on shift.  Like I
15  started a shift at, say, 6:00 in the morning, and
16  before noon I was finished with this.
17
18      (Whereupon, Defendants' Exhibit 13 was marked
19       for identification and copy of same is
20       attached hereto.)
21
22    Q   (BY MR. LANKFORD:)  All right.  The next
23  thing I have is Fire System Check List.

1    A    Uh-huh. (Witness indicates
2  affirmatively.)
3    Q    That's exhibit whatever it is.
4    A    Yeah, 13.
5    Q    All right.
6    A    Yeah.
7    Q    Tell me about that.
8    A    Lloyd asked me while I was out making my
9  rounds on all the marine equipment while we were
10  loading, if I could inventory each vessel as I
11  went on them and let him know what was there.
12  And it was in regard to components and whether or
13  not I thought that the equipment was operational
14  and what I thought might be a good check on it,
15  like I got -- The categories I have, visual daily
16  inspection, weekly inspection, monthly inspection,
17  seals intact, various indicator panels, functional
18  test of equipment, labels on all the equipment that
19  I looked at.
20        You know, just on each one I got -- I
21  have a Fire System Check List on everything
22  Drummond had floating on the fleet, and as part of
23  my extra task while I was out there to do this.

1  And this took place over, you know, I think over a
2  period of one rotation, as I was on each one.
3    Q    Two weeks?
4    A    Yeah. I mean, it wasn't a constant
5  all-day affair. It was, if I happened to be on
6  that vessel, I'd make up a check list and run down
7  it, you know, for each one as I was out there.
8  And then I'd continue with the work of loading the
9  ships, directing the loading of the ships. And as
10  I moved to the next piece of equipment, if I had
11  time I'd do this.
12        So this was a kind of a get-it-when-I-can
13  kind of a deal. But it wasn't a -- you know, it
14  wasn't -- wasn't a full -- full-blown all-day
15  effort for two weeks every day. This was several
16  hours per day, depending on which vessel I was on.
17    Q    Okay. What was done with that
18  information that you furnished on Exhibit 13, do
19  you know?
20    A    I gave it to Lloyd, and that's the last
21  I saw of it. He requested me to give him this
22  information, I gave it to him, and what he did with
23  it after that I don't know.

1        (Whereupon, Defendants' Exhibit 14 was marked
2        for identification and copy of same is
3        attached hereto.)
4
5    Q    (BY MR. LANKFORD:)  Okay. Exhibit 14
6  appears to be a Quick Change Barge Transit?
7    A    Right. This was an idea that I had as
8  crane supervisor. All the cranes had to be able to
9  shift the barge alongside the crane in order to
10  unload it evenly, you had to slide up it and down
11  the barge. And the system they had was, we had to
12  make a splice in the end of the cable into a ring
13  with another sling off of that grabbed the barge
14  and they'd slide it back and forth with the
15  winches, and it was always a problem.
16        And when the cables broke, and they broke
17  often, there was a lot of downtime involved in
18  fixing those cables. So I came up with this design
19  after many hours of observation, tried to figure
20  out what the problem was and how to make the repair
21  go faster because we weren't going to stop breaking
22  cables. So I figured the best thing to do would be
23  make the system safer and figure out a way to make

1  the repairs faster. So I designed this and I
2  turned it in to Drummond.
3    Q    Who asked you to design it?
4    A    Nobody did. I did it on my own. I just
5  took the initiative and ran with it.
6    Q    Okay. How long did that take?
7    A    This, couple hours.
8    Q    Well, who did you turn it into?
9    A    I either gave it to Lloyd or Don. Let's
10  see, when -- what date I got on there. I gave it
11  to Lloyd. I gave it to Lloyd and I gave it to
12  Harry Hughes, because part of the winch problem was
13  Harry Hughes' problem because he was the equipment
14  supervisor.
15    Q    Was this suggested plan ever implemented,
16  to your knowledge?
17    A    No.
18
19        (Whereupon, Defendants' Exhibit 15 was marked
20        for identification and copy of same is
21        attached hereto.)
22
23    Q    (BY MR. LANKFORD:)  The next group of

Page 158

1  documents that I see, which is whatever my next
2  exhibit is -- 15, wasn't it?
3        BY MR. HILLEREN: 15, yeah.
4     Q   (BY MR. LANKFORD:) 15 appears to be
5  dated 7-21-01 and it has to do with fire drills,
6  and abandon ship drills, and man overboard drills.
7  Do you remember that project?
8     A   Yeah.
9     Q   Who gave you that project?
10    A   Nobody, I did it on my own. I saw a
11  need. We didn't have -- We didn't have these
12  procedures in place on any of the vessels, we
13  didn't have any consistency at all, so I thought
14  for the safety of the fleet we should have
15  consistency among all the vessels.
16        And I wrote this and turned it in to -- I
17  don't know who I turned it in to, probably to Don.
18  Might have been to Lloyd. Anyway, I detailed for
19  each vessel fire, man overboard, abandon ship,
20  general instructions to follow, and turned it in
21  and it disappeared.
22    Q   You don't know what happened to it?
23    A   Didn't -- Nothing happened to it.

Page 159

1  It just went away, like most things around there.
2  They ask you to be proactive and take the
3  initiative, and people who did for the most part
4  were ignored.
5     Q   How long did this task take?
6     A   I don't know, maybe a day or two. I
7  usually -- I usually -- No, actually longer,
8  because I did it for each vessel. So when I went
9  on each vessel over the period of one rotation, I
10  assessed the vessel and then wrote the procedure.
11        So it wasn't, you know, an all-day affair
12  every day. During a rotation and while you were
13  out at sea, you'd switch from vessel to vessel
14  throughout the shift.
15    Q   Well, my question is: How long did that
16  take you, roughly?
17    A   Hour a day, one rotation.
18    Q   Two weeks?
19    A   Two weeks, yeah.
20    Q   Fourteen hours?
21    A   Yeah, yeah. I'm just guessing, you
22  know. COLOMBIA 4 took the longest because it had
23  the most equipment and most things to consider.

Page 160

1  The EVITA took less because, not much there.
2     Q   Okay.
3     A   What's this calendar underneath, is that
4  anything, or is that --
5     Q   Well, let's see.
6     A   The list of vessels and the calendar.
7     Q   Wait a minute, I've got some more things
8  here.
9     A   Okay.
10        BY MR. LANKFORD: If it's getting hot,
11  I'll turn that thing back on, whatever y'all want
12  to do.
13
14      (Whereupon, a discussion was had off the
15      record.)
16
17      (Whereupon, Defendants' Exhibit 16 was marked
18      for identification and copy of same is
19      attached hereto.)
20
21    Q   (BY MR. LANKFORD:) Show you Exhibit 16,
22  which appears to be some specifications for
23  repairs.

Page 161

1     A   Yeah.
2     Q   And ask you to look at that, please?
3     A   Okay. Yeah. Yeah, I remember this.
4     Q   Tell us about that exhibit, if you will.
5     A   That was a request, ongoing request by
6  maintenance. They were complaining that they never
7  got any repair orders, they were just having to put
8  out fires all the time. And so, Don Hamilton and
9  maintenance asked me to go around to all the
10  vessels and pretty much do an audit on things I
11  thought that needed to be repaired or replaced.
12        So I went around to all the vessels in
13  one day at the end of the shift, and generated
14  this, and turned it in.
15    Q   One day?
16    A   Yeah. One afternoon really, only took
17  about four hours. This one in particular, this
18  repair order --
19    Q   What one is that?
20    A   It's --
21        BY MR. HILLEREN: 6-1-02.
22        THE WITNESS: It's giving all -- Well,
23  it's describing nondestructive testing and

Page 162

1  hydrostatic testing of all the air receivers on all
2  the cranes and all the boats.
3      BY MR. HILLEREN:  Page 9.
4      THE WITNESS:  They had a real problem
5  with this, because we had a lot of air receivers,
6  and they were ASME code air receivers, which is
7  supposed to be hydro tested and thickness checked,
8  I believe every five or six years.  And some of
9  these were forty-one years old and never had been
10 inspected.  So they were looking at a, you know, a
11 lot of -- a lot of things to do if they were to
12 check this out.
13     Q   (BY MR. LANKFORD:)  And that was on all
14 the crane barges?
15     A   That was on all the crane -- all the
16 floating assets.  They had one air receiver or
17 another, small ones, large ones.
18     Q   What's an air receiver?
19     A   Air tank, like for a compressor.
20     Q   Okay.
21     A   They had some -- you know, some little,
22 some big, but they're all required to be inspected
23 and checked various kinds of ways, because they

Page 163

1  were all stamped ASME coded vessels.  So to comply
2  with the code, you're supposed to check them
3  periodically.  They're not easy to check, so they
4  had a real hard time with that.
5      So this just -- like I said, this was all
6  the vessels.
7      Q   Okay.  So you don't know what was done
8  with this, either?
9      A   It was turned in, and actually I talked
10 to Jose Luis Velasquez.  He was at the time moved
11 ashore and was working in maintenance and generated
12 work orders for the maintenance department.  And he
13 was expecting these; I told him I had, I believe it
14 was fifteen pages of repair orders, and I told him
15 I wrote them and I turned them in, and he was
16 waiting for them.
17     And several days later, or weeks later --
18 well, nineteen days later they weren't done yet,
19 because I left Drummond on 6-20.  So after I turned
20 this in, they -- Drummond management had a lot
21 of -- I don't know how to describe it.  They
22 weren't happy about it.
23     Q   Well, you were doing what you were asked

Page 164

1  to do, weren't you?
2      A   Yes, sir.  But when I told them what --
3  gave them what they wanted, they didn't like what
4  they saw.
5      Q   Who told you that?
6      A   Nobody.  It just -- It just disappeared.
7  Harry Hughes said something about the air
8  receivers.  He specifically said, you know, well,
9  we're not going to comply with that code just
10 because they're stamped, we're not going to comply
11 with it.
12     I told him, I said, you got air receivers
13 forty-one years old, there's a lot of internal
14 corrosion in them, the thing's like a time bomb,
15 you put pressure on it, it could blow up, you know,
16 if the metal got thin enough.  And he was very
17 adamant about, we're not doing that.
18     Q   Okay.  But the request was made by Don
19 Hamilton?
20     A   Yeah, initially, yeah.  He's the one that
21 asked me to go around and generate repair orders.
22     Q   Okay.  All right.
23     A   See if there was anything concerning

Page 165

1  safety or maintenance that needs repairs.
2      Q   Okay.
3      A   And I turned it in to Don, and Harry was
4  around there somewhere.  He saw the one about the
5  air receivers and blew up.  He got pretty -- pretty
6  mad about it.
7      BY MR. LANKFORD:  Okay.  Excuse me a
8  minute.  I'm missing some stuff.
9
10     (Whereupon, there was a brief recess had in
11     the deposition.)
12
13     (Whereupon, Defendants' Exhibit 17 was marked
14     for identification and copy of same is
15     attached hereto.)
16
17     Q   (BY MR. LANKFORD:)  Mr. Mayfield, I'm
18 going to show you Exhibit 17 --
19     A   Uh-huh.  (Witness indicates
20 affirmatively.)
21     Q   -- which appears to be the daily calendar
22 that you furnished?
23     A   Uh-huh.  (Witness indicates

Page 166

1    affirmatively.)
2
3        (Whereupon, Defendants' Exhibit 18 was marked
4        for identification and copy of same is
5        attached hereto.)
6
7        Q   (BY MR. LANKFORD:)  Exhibit 18 appears to
8    be the diving log that you've already been --
9    you've already seen, I'm sure?
10       A   Yeah.  This is the one they had in
11   Colombia?
12       Q   Yeah.
13       A   Okay.  Yeah.
14
15       (Whereupon, Defendants' Exhibit 19 was marked
16       for identification and copy of same is
17       attached hereto.)
18
19       Q   (BY MR. LANKFORD:)  And Exhibit 19, which
20   is where I've gotten a paralegal to put dive
21   wherever the diving log says, and then where you
22   went aboard a vessel, a deep sea vessel to either
23   acquaint the captain with the procedure when he

Page 167

1    first arrived or when the vessel was completed
2    loading and you went aboard to, as I understand it,
3    get the bills of lading signed and perhaps other
4    things, I'm not sure.
5        A   Yeah, yeah.
6            Is that supposed to be all correlated off
7    these two?
8        Q   Exactly.
9        A   Okay.
10       Q   Exactly.  Wherever there's some notation
11   in the diving book, diving log I should say, the
12   word dive is there.  There's several that I'm not
13   sure about that I wanted to ask you about.
14       A   Well --
15       Q   So would you look at your diving log,
16   please, sir?
17       A   Okay.
18       Q   Page -- It looks like page 1, you've got
19   an initial by Amaya, Edgar Amaya, and then you've
20   got RM?
21       A   Uh-huh.  (Witness indicates
22   affirmatively.)
23       Q   Does that mean you dove or Edgar did?

Page 168

1        A   I think Edgar did, and I checked his
2    decompression.
3        Q   So you did not dive then?
4        A   I don't really know, to tell you the
5    truth.  Usually if it says diver, I wrote my name
6    as the diver, or if it was two of us diving I
7    wrote, you know, both us of together.
8        Q   You had the same entry twice if both of
9    you dove; is that right?
10       A   I'm trying to see.  No, on the first
11   page, Amaya dove by himself.
12       Q   All right.
13       A   Because I could see his head, so.
14       Q   Okay.  So where you have the initial, you
15   didn't dive but you were present?
16       A   I was present, yeah.
17       Q   Okay.
18       A   Or like when we first started this, I was
19   checking the guys' decompression.  They didn't use
20   the tables a lot, because a couple of the guys were
21   qualified, but they never used the decompression
22   tables there.  They just dove.  And I got them
23   started getting in the habit of recording bottom

Page 169

1    times and depths and doing the decompression
2    tables, and everything else.  They weren't doing
3    that before I got there.
4        Q   Is that a dangerous procedure?
5        A   Very dangerous.
6        Q   But if you're diving in ten feet of
7    water, it's not critical, is it?
8        A   It's critical if you dive in ten feet of
9    water and then go to a hundred feet of water.
10       Q   Okay.  Tell me how you made this log.
11           Would you -- Did you have a rough log and
12   then a smooth log?
13       A   No, this is the only one.
14       Q   Who would record the -- LS means leaving
15   the surface?
16       A   Yes.
17       Q   LV means leaving the bottom?
18       A   Right.  RS is resurface.
19       Q   Is resurface.  And TBT is total bottom
20   time?
21       A   Right.  At the end of the dive, he was
22   Group A, depth of five feet.
23       Q   What does Group A mean?

43 (Pages 166 to 169)

Page 170

1    A   On the diving tables, as you end a dive
2  for a depth, you get -- depending on the depth and
3  the time, you get put into a group.  And there's a
4  chart that goes all the way across, and you use
5  that group letter to determine, if you make another
6  dive, what your residual nitrogen time is.  Like,
7  in other words, a penalty against the next dive in
8  bottom time.
9    Q   All right.
10    A   And if you don't make another dive, it
11  doesn't mean anything.  But you can do multiple
12  repetitive dives, every dive is a group, and that
13  group is the time accumulated, whether by single
14  dive bottom time or multiple dives.  For instance,
15  if you go fifty feet -- And this is not following a
16  table, but just an example.
17        If you go to fifty feet for ten minutes,
18  and you made a previous dive for whatever depth
19  and you had a ten-minute penalty, then your total
20  bottom time for that dive including the penalty
21  would be twenty minutes, even though you actually
22  only spent ten minutes on the bottom.  But you had
23  to decompress, according to the table, for twenty

Page 171

1  minutes.
2    Q   Okay.
3    A   So, that's -- If you're making multiple
4  dives, it becomes important.  And that was one of
5  my big concerns about the way the guys were diving
6  out there, because they were bouncing up and down
7  all over the place.
8    Q   Okay.  Let me use this again just a
9  minute, if I may.
10    A   Sure.
11    Q   Lost it again.
12        Okay.  Are these only -- These times and
13  bottom times and all this are approximate, are they
14  not?  They're not precise, are they?
15    A   No, they're precise.
16    Q   They are?
17    A   Yeah.
18    Q   How do you know on December 1 that --
19  Well, you said you were there, but let's take a
20  dive -- Let's go to page 3, and it says Richard.
21  And I assume that's you?
22    A   Yeah.
23    Q   You left the surface at 11:30.  How do

Page 172

1  you know that you did that?
2    A   My watch.
3    Q   You punch in your watch?
4    A   Yeah, I just turn the bezel to when I
5  leave the surface.
6    Q   All right.  When you leave the bottom, do
7  you do the same thing?
8    A   No.
9    Q   What do you do then?
10    A   I just look at my watch when I leave.
11    Q   All right.  And then you return to the
12  surface, look at your watch again?
13    A   Yeah, yeah.  You make a constant -- You
14  make an ascent rate of twenty-five feet a minute,
15  or I do.
16    Q   And how do you get back up?
17    A   You would climb -- climb the chain, climb
18  the rope, or make a free ascent.
19    Q   Chain is to a buoy?
20    A   Yeah.  Depends on what you're diving on.
21    Q   And a line is to a buoy or it might be to
22  an object you're going to dive on?
23    A   Could be any number of things.

Page 173

1    Q   But you haul yourself back up?
2    A   Yeah.
3    Q   Even in eight feet of water, you're not
4  going to come up but -- It takes you a minute to
5  come up twenty-five feet?
6    A   Twenty-five feet a minute is the standard
7  ascent time.
8    Q   But isn't that for deep dives?
9    A   For all dives.
10    Q   So, okay.  Well, let's look on page 3 --
11  Well, that's Amaya.
12        You subtract the leaving the surface time
13  from the return to the surface time, right?
14    A   Right.
15    Q   And that gives you the --
16    A   From leaving surface to leaving bottom.
17    Q   Right.  And that gives you the total
18  bottom time?
19    A   Right.
20    Q   In the middle of the page there, it
21  talks about leaving at 8:29 and then returning to
22  the surface at 0852, which would be twenty-three
23  minutes, would it not?

Page 174

1    A   From leaving the surface to leaving the
2   bottom is twenty-one minutes.
3    Q   I see.  This is from leaving the surface
4   to leaving the bottom?
5    A   Right, right.
6    Q   Okay.
7    A   And your ascent time is from 0850 to
8   0852, from a depth of ten feet.  And it's two
9   minutes from ten feet because it took that long to
10  get out from underneath the tug.
11   Q   Two minutes, ten feet to get out from
12  under the tug?
13   A   Yeah, because you're underneath the
14  vessel.
15   Q   Okay.  All right.  Mayfield on December
16  the 2- -- I can't make that out -- 26th, I guess,
17  Richard Mayfield leave at 0717, and you see that
18  series there?
19   A   Yeah.
20   Q   It took three minutes to come up fifteen
21  feet; is that correct?
22   A   Yeah, we were underneath the MICHAEL T.
23  You got to get -- You know, we were de-rigging

Page 175

1   stuff and turning things loose.  From the time we
2   left the bottom to clear everything from the tires
3   hanging underneath the water and everything else,
4   took that long to get to the surface.
5    Q   Okay.  January 24, let's go to page --
6   looks like page 8.  That's the dive that you made
7   that we've talked about?
8    A   Right.
9    Q   Except that has you going on January 24
10  instead of January the 25th?
11   A   Yeah.
12   Q   That gets back to the strike-over of the
13  four and the five?
14   A   Right.
15   Q   Does this refresh your memory that the
16  dive you made was on the 24th instead of the 25th?
17   A   Yeah.  Yes, it does.
18   Q   Okay.
19   A   But I don't know who struck out, who or
20  why that was struck out.
21   Q   I don't know either, I'm just saying:
22  Does that refresh your memory?
23   A   Yeah.

Page 176

1        BY MR. HILLEREN:  What it says at the
2   bottom there, that they removed a three-quarter
3   chain from between the propeller blade tip and the
4   Kort nozzle on the starboard side, you know, which
5   makes me think it is the 24th, but.
6    Q   (BY MR. LANKFORD:)  Well, I'm just asking
7   now, because there's a day's difference between the
8   accident report and --
9    A   Yeah, and I -- and I don't know how that
10  occurred, or why, or who might have done it.
11       BY MR. HILLEREN:  Okay.
12   Q   (BY MR. LANKFORD:)  Okay.  Let's look at
13  this sheet.  Sometimes these dives were done on
14  buoy systems just to check them, were they not?
15   A   Yes.
16   Q   See if I can't find it.
17       I see a number of dives that were made
18  with you involved after January 24, sometimes
19  three, on February the 24th.  You might want to
20  find that.  It looks like you made three dives on
21  that day.
22   A   When?
23   Q   February the 24th.

Page 177

1    A   Okay.
2    Q   Is that what that looks like to you?
3    A   Yeah.
4    Q   And were you able to perform the dives
5   that you made, physically, after January the 24th
6   on the dates mentioned, whenever they're found in
7   the diving log?
8    A   Uh-huh.  (Witness indicates
9   affirmatively.)
10   Q   And you had the physical capability to
11  perform those dives and do whatever was called for?
12   A   Yeah, you just climb down a ladder, put
13  the tank on in the water, and go underwater, and
14  you're weightless.
15   Q   All right.  And whatever repairs or
16  whatever you had to do, or whatever the findings
17  you made, you were able to do that physically, were
18  you not?
19   A   I usually documented the findings, yeah.
20   Q   Well, whatever you had to do, you were
21  able to do it physically, were you not?
22   A   I didn't do all of it.  This was a
23  description of what activity -- activities took

45 (Pages 174 to 177)

Page 178

1  place during the dives, but it doesn't necessarily
2  mean I performed these activities.
3      Q    But you were able to stay down long
4  enough to perform the diving maneuver on each of
5  these occasions --
6      A    Yeah, yeah.  Yeah.
7      Q    -- mentioned in the dive book; is that
8  right?
9      A    Yeah, right.
10     Q    Even though you say you had suffered an
11 accident on January the 24th?
12     A    Right.
13     Q    Okay.
14     A    I have two compressed discs in my lower
15 back, two herniated discs.
16     Q    Okay.  And you were able to do that all
17 right, nonetheless?
18     A    Very carefully, yeah.
19     Q    Okay.  But you did it?
20     A    Yeah.  I had to keep my job, so I did
21 what it took.
22     Q    Okay.  All right.  Now, going to your log
23 book, that is to another exhibit now, that -- Yeah.

Page 179

1      A    Exhibit 17.
2      Q    That's all in your handwriting, is it
3  not?
4      A    Yeah.
5      Q    And you can refer to Exhibit 19, if you
6  like, which is this composite that we talked about.
7      A    Well, the composite I don't know about
8  the accuracy of it.
9      Q    That's okay, I understand that.  But
10 let's assume that it's okay.
11         Were you asked to slow down your diving
12 activity and not dive anymore at any time that you
13 can recall?
14     A    No.
15     Q    You were not?
16     A    No.
17     Q    Didn't you have an incident in January of
18 2002, almost a year to the day?
19     A    Yeah.
20     Q    Okay.
21     A    And Marc made a big deal out of that.
22     Q    Well, did Marc ask you to stop diving?
23     A    No.

Page 180

1      Q    Did Don Hamilton ask you to stop diving?
2      A    No.  Nobody ever asked me to stop diving.
3      Q    Okay.
4      A    No, I had a wave snatch the boat out from
5  under me while we were out at one of the deeper
6  buoys.  We had the boat tied up to one of the big
7  buoys, and the sea action, I was standing on the
8  bow of the boat and the sea action tightened up the
9  bowline that we had it moored to and snatched the
10 boat out from under me.  And I had to step down
11 onto the deck in the middle, sprained my ankle or
12 something.
13     Q    And you've testified that you were able
14 to perform these dives that appear in your dive
15 book after January 24, 2001?
16     A    Yes, yeah.
17     Q    Now --
18     A    I changed a few things, but I was able to
19 do them.
20     Q    What did you change?
21     A    I didn't put on my equipment till I was
22 in the water after that, my SCUBA bottle.  I just
23 lowered it over the side on a piece of line and

Page 181

1  climbed down a ladder, put my equipment on in the
2  water.  Same thing when I came out of the water,
3  I'd ditch the equipment, tie the line onto it, and
4  let them pull it up.
5      Q    You like diving, don't you?
6      A    Yeah.  Yeah, I've done it all my life,
7  pretty much.  Haven't done any diving since I left
8  Drummond.
9      Q    Have you had any opportunities to do it?
10     A    Yeah.
11     Q    With whom?
12     A    A couple of the jobs there, they asked me
13 if I wanted to, but I didn't do it.
14     Q    SCUBA diving?
15     A    No, hard diving.
16     Q    When's the last time you hardhead dived?
17     A    Oh, it's been years ago.
18     Q    How many years ago?
19     A    At least ten.  Probably more than that.
20     Q    Fifteen?
21     A    Let's see, say about five years before I
22 left Taylor Diving, whatever year that is on my
23 resume.

Page 182

1    Q   These vessels that have been named here
2  on Exhibit 19 --
3    A   Uh-huh. (Witness indicates
4  affirmatively.)
5    Q   -- are deep sea vessels?
6      Go ahead and look at it, please.
7    A   Yeah, ships.
8    Q   Yeah.  You greeted the vessels when they
9  came in, and you went aboard them when they were
10  fully loaded to get the master to sign the bills of
11  lading; is that the general routine, or am I --
12    A   Yeah, whatever took place on my rotation.
13  I might have greeted a vessel, and then my rotation
14  ended, and then the A and B Crew may have closed
15  the vessel out, or sometimes vice versa.
16    Q   Were you on the C Crew?
17    A   Yeah.
18    Q   C Crew, letter C?
19    A   Not always.  I had switched from several
20  crews.
21    Q   So, you may or may not have seen the
22  vessel when it came in?
23    A   Right, right.

Page 183

1    Q   And depending on when it finished
2  loading --
3    A   The ships took -- The bigger the ship,
4  the longer it took to load.
5    Q   Now I'm asking about your activities
6  subsequent to January 24, when this incident
7  happened.  After January 24, how did you get to a
8  vessel when they first arrived to welcome them and
9  tell them the protocol and all that?
10    A   Sometimes the crane went out to the
11  vessel and tied up alongside as soon as the ship
12  was moored.  Sometimes if some other ships were in
13  the area being loaded, I took a tug out there or a
14  crew boat.  Now, it depends on what the situation
15  was.
16    Q   The vessel was in ballast waiting to be
17  loaded, right?
18    A   De- -- Usually either ballasted, but for
19  the most part they were de-ballasted.
20    Q   De-ballasted?
21    A   Yeah.
22    Q   Ready to receive their cargo?
23    A   Yeah, the bigger ships didn't do that.

Page 184

1  The capes, the capes came in ballasted.
2    Q   And did you climb up the Jacob's ladder?
3    A   Yes.
4    Q   And to go over the gunwale?
5    A   Yes.
6    Q   And I know it depended on the freeboard
7  and all that, but generally speaking, would that be
8  a thirty- or forty-foot climb on a ship's ladder?
9    A   Yeah.
10    Q   Were you able to do that physically?
11    A   As long as they had the right kind of
12  ladder.
13    Q   And what kind of ladder?
14    A   Well, a ladder with the extensions so the
15  ladder wouldn't twist.  I forget what they call it,
16  but there's a name for them, but there's ladders
17  that have spreader bars in them about every ten
18  rungs and the ladder won't twist.
19    Q   Yeah, right.
20    A   If they didn't have that kind of ladder,
21  I wouldn't even attempt it.
22    Q   Well, you didn't want to do that anyway,
23  would you?

Page 185

1    A   No.
2    Q   Whether you'd hurt your back or not,
3  because that's --
4    A   No.  No, those ladders were real
5  dangerous.  A lot of times they'd lower the gangway
6  down.
7    Q   But you'd still have to make a
8  crossover from the rope ladder to the gangway,
9  though?
10    A   Yeah, but that usually wouldn't be more
11  than a ten-foot climb up a rope ladder.
12    Q   Sometimes they'd have them, sometimes it
13  was a thirty- or forty-foot climb?
14    A   Sometimes.
15    Q   And if they didn't have the spreader bars
16  in there, you wouldn't go until you did get one
17  with spreader bars?
18    A   Exactly.  That was a requirement, that
19  was port regulations.  That was port regulations.
20    Q   And I think it's also a SOLAS?
21    A   Yeah, it is.  But some of Greek ships
22  didn't have them, Greeks are --
23    Q   Okay.  But you were able to come over and

Page 186

1   put your foot down, come down on deck and climb the
2   stairs to the wheelhouse or find the mate or the
3   master?
4      A   Usually they met me at the top of the
5   ladder.
6      Q   And you would go to the master's quarters
7   or the mate's quarters?
8      A   I would usually go to the -- On the main
9   deck there was usually a -- I forget what they call
10  it.
11     Q   Galley?
12     A   A radio room kind of thing, was usually
13  on the main deck.
14     Q   This is an incoming vessel we're talking
15  about?
16     A   Both to greet it and to close it out.
17     Q   Okay.  And you could navigate thirty or
18  forty feet up the Jacob's ladder if it had a
19  spreader --
20     A   Yeah, right.
21     Q   -- and get over on down, and come down on
22  deck, go meet the mate or the master, conduct your
23  business, and then go back down?

Page 187

1      A   Yeah.  I'd climb up one foot at a time,
2   you know, slowly.  I'd usually -- I'd usually lift
3   with my left -- Well, I'd usually lift with my left
4   leg; I wouldn't lift with my right leg.
5      Q   All right.  You're not going to climb two
6   rungs at a time, anyway, are you, up forty feet in
7   the air?
8      A   Not left, right, left, right.  Left,
9   left, left, left.
10     Q   Okay.  But my point is, you're not going
11  to be scampering up a ship's ladder under any
12  conditions?
13     A   No, no.  Some of the Colombians did, but
14  not me.
15     Q   Well, but they're younger and lighter,
16  aren't they?
17     A   Oh, yeah, yeah.
18     Q   Don't feel bad.  They say I'm old as
19  dirt, so I don't care.
20     A   No, I wasn't -- I wasn't real fast
21  climbing ladders.
22     Q   And you could do that physically okay on
23  all those vessels we've looked at?

Page 188

1      A   Yeah, right.  It wasn't an everyday
2   occurrence.
3      Q   Well, it's whatever occurrences are in
4   your log?
5      A   Yeah, right.
6      Q   And --
7      A   Yeah, if they got a stamp on here, I
8   closed the vessel out.
9      Q   You used the vessel stamp, and when you
10  say closing it out, you got him -- after loading,
11  you got him to sign, a mate or a master to sign
12  onboard a bill of lading?
13     A   Right.
14     Q   And then you left a copy of that with
15  them and took the rest of the documents back with
16  you?
17     A   The surveyor that I worked with usually
18  left the ship a copy of it.  All I took was the
19  Drummond documents.
20     Q   Okay, okay.  So the surveyor would have
21  the before and after drafts?
22     A   Right.
23     Q   And then you get the mate to --

Page 189

1      A   Surveyor would do the draft survey when
2   we got there, and then he'd do the draft survey
3   when he left.  And that's how they -- By the draft
4   surveyor is how they got the tonnage of the cargo,
5   which was what Drummond billed -- billed with.
6      Q   Right.  Billed their customer, right.
7         And you were able to climb the ships'
8   ladders and come back down the ships' ladders, the
9   same way you got up, on all those vessels?
10     A   Yeah, yeah.
11     Q   You mentioned that in your logs, that had
12  the stamp on it --
13     A   Yeah, right.
14     Q   The vessel stamp on it?
15     A   Yeah.
16     Q   Sometimes it looks like a Drummond stamp.
17     A   Yeah, sometimes the ships -- Actually I
18  got the ship's chief officer or the captain to
19  stamp my logbook just -- that was just a souvenir.
20     Q   This was an extra deal right here?
21     A   Yeah, this wasn't anything, this was just
22  my --
23     Q   Excuse me.

48 (Pages 186 to 189)

Page 190

1      A    This was just my personal little logbook.
2    I just got the ships to stamp it just more or less
3    as a souvenir, but most of them were happy to do
4    it.
5      Q    So Drummond had its own document besides
6    this document?
7      A    Oh, yeah.
8      Q    Okay.  What did Drummond call that
9    document?
10     A    There was a closeout package you got,
11   which was probably -- I'm trying to recall.
12   Closeout package was about eight or ten pages
13   of documents that had to be filled out by the
14   surveyor and the ship's captain or chief officer.
15   And the port entry package was similar.  So
16   there's documentation that Drummond holds for
17   when I approved a ship to be loaded then for when
18   the ship was closed out.
19     Q    Is it possible that you went on vessels,
20   either to meet them or close them out, that aren't
21   in your calendar thing?
22     A    It's possible.
23     Q    Well, however many's showing up there,

Page 191

1    you were able to do that physically, going onboard
2    or --
3      A    See, some of these vessels that if I
4    didn't get the ship's stamp, I didn't close them
5    out.  That was what the bill -- bill of lading
6    number was for the ship, even though it was on my
7    shift, you know, we had two crews worked on one
8    shift.  Actually three crews worked in one two-week
9    period.
10          First week you had, for instance, A
11   Crew -- C Crew on nights.  I was on C Crew on
12   nights, and then A Crew would be on days.  And then
13   I shifted over from night shift to day shift, and
14   one crew rotated out for their week off and another
15   crew came on.  So all three crews were working
16   during a three-week period -- I mean, a two-week
17   period, I'm sorry.  One crew was always on a week
18   off.
19          So if a ship, say it closed out, like I'm
20   looking at January 24, 2002, PEARL ANNIVERSARY's
21   bill of lading number was 89,258.7 metric tons.  I
22   didn't close that ship out, but I wanted to know
23   what the bill of lading number was, because they

Page 192

1    were always raising hell about tonnage.
2      Q    How do you know you didn't close that
3    out?
4      A    Because I didn't get a ship stamp on it.
5      Q    All right.  I see.
6      A    But I did write down the information.
7      Q    I see, okay.
8      A    And there was a lot of those like that in
9    there.  If I didn't close it out, I didn't climb on
10   the ship.
11     Q    Okay.  So the ship's stamp is the key to
12   that?
13     A    Yeah.  And I got a lot of entries in here
14   that show the bill of lading number, because we
15   went -- we went tonnage per day and tonnage per
16   two-week period, and they were always throwing
17   numbers up at us, say, well, we didn't make enough
18   tonnage, we didn't make enough tonnage.
19          And when I first started doing this,
20   they were doing that about the tonnage and I never
21   knew what kind of tonnage was being performed.  So
22   I just started keeping records of it.  That way, if
23   somebody said something about it, I'd look back in

Page 193

1    my book and go, well, we did this much -- many tons
2    this month, so, you know, what's your problem.
3      Q    This has a Drummond stamp on it and it
4    has some --
5      A    The CORAL EAGLE?
6      Q    Yeah.
7      A    Yeah.
8      Q    Does that mean you went aboard it or not?
9      A    No, I didn't go aboard it.
10     Q    Okay.  But whether this shows fifteen
11   vessels or a thousand vessels with the stamp on it,
12   the vessel stamp -- Now, I don't know how many it
13   shows --
14     A    Uh-huh.  (Witness indicates
15   affirmatively.)
16     Q    -- you were able to board these vessels
17   and have the vessels stamp?
18     A    Yeah.
19     Q    And when they came in, do you get the
20   vessel stamp also?
21     A    No, just when they're closed out.
22     Q    Okay.
23     A    And that, just because I closed a ship

Page 194

1  out doesn't mean that I'd opened it up, either.
2      Q   Okay.  All right.  But I'm saying whether
3  it's fifty or a hundred or whatever, you were able
4  to climb up the ships' ladder and perform your work
5  physically --
6      A   Right.
7      Q   -- after this accident?
8      A   Right.
9      Q   For whatever dates the vessel's owner or
10  operator stamps on there?
11     A   I was moving a lot slower, but I needed
12  my job, so I toughed it out.
13     Q   Okay.  All right.  Now, did you climb up
14  into the cabs of Crane Number 4 after you were
15  hurt?
16     A   Yeah.
17     Q   And how many feet is that up there?
18     A   It's in stages.  It's like four stories
19  tall.
20     Q   Forty, fifty feet?
21     A   Yeah, whatever a four-story building is,
22  that's about how tall the COLOMBIA 4 is.
23     Q   And you climbed up and down the ladder

Page 195

1  hundreds of times?
2      A   No, a lot -- Yeah.  I don't know if it's
3  hundreds, but it's a lot.
4      Q   After you were hurt?
5      A   Yeah.
6      Q   And you were able to do that, were you
7  not?
8      A   Yes.
9      Q   And perform your work?
10     A   Yeah.
11     Q   Okay.
12     A   Like I said, I got a lot slower, but I
13  had to tough it out, keep my job.  Wasn't nobody
14  else going to pay my bills for me.
15     Q   All right.
16
17     (Whereupon, a discussion was had off the
18     record.)
19
20         THE WITNESS:  I know about this one and
21  this one; that one I'm not sure about.
22     Q   (BY MR. LANKFORD:)  I understand.  I'm
23  not asking you, I'm just saying that --

Page 196

1      A   Okay.
2      Q   I was just trying to see how many we were
3  on dives and things like that where I had question
4  marks.
5      A   Yeah, yeah.
6      Q   I hadn't counted them, I have no idea how
7  many are dives or -- I don't know.
8
9      (Whereupon, Defendants' Exhibit 20 was marked
10     for identification and copy of same is
11     attached hereto.)
12
13     Q   (BY MR. LANKFORD:)  You might have seen
14  this picture before, or your lawyer may have shown
15  you.
16         Is that you asleep?
17     A   No, not asleep.  I just laid down.
18     Q   On what?
19     A   That's on -- I'm trying to think what
20  vessel that is.
21         I think that's the DELFIN.
22         Do you know what date this was?
23     Q   I have no idea.

Page 197

1      A   It's probably after, my back was probably
2  hurting.  I just laid down up there.  Usually you
3  had a twenty, twenty-five minute ride out to the
4  mooring area, and if the boat was real crowded
5  below and it was nice, I'd lay down and rest my
6  back before we got out there.
7      Q   Well, but the DELFIN wasn't the boat you
8  rode on, it was the EVITA, wasn't it?
9      A   No.  We rode the DELFIN and EVITA.
10     Q   You rode both of them, they're both crew
11  boats?
12     A   Yeah.
13     Q   Oh, okay.
14     A   Yeah, we -- I mean, there wasn't any set
15  boat.  We would ride whatever one was available.
16     Q   All right.
17     A   Whatever one was running.  They weren't
18  always running all the time, either one of them.
19  You know, they had lots of problems.
20     Q   Were you ever warned about sleeping by
21  Mr. --
22     A   Yes.
23     Q   Who warned you about it?

Page 198

1   A   Lloyd.
2   Q   And what was the occasion about that?
3   A   That was like the first day I was there.
4   Q   And where were you asleep?
5   A   I was in the office on COLOMBIA 4.  It
6   was when we first started working night shifts, and
7   I just got there the first day.  I was tired and I
8   fell asleep.
9   Q   The cab is air conditioned, isn't it?
10  A   The office, yeah.
11  Q   On the COLOMBIA 4?
12  A   Yeah.
13  Q   I meant the cab, office.
14  A   Yeah, yeah.
15  Q   What did he tell you?
16  A   Well, he told me that was not -- He said,
17  you might do it in the Gulf of Mexico, but you
18  don't do it here, and don't let me see you do it
19  again.  I said, okay.  He says, even if you get
20  tired, everybody gets tired, but he said, we don't
21  do things the same way you used to do them.
22       I told him, I said, I just had a little
23  catnap.  And he said, well, we don't do that here.

Page 199

1   Q   All right.  What about Mr. Delsack
2   warning you, did you go to sleep on the EVITA on
3   the way out?
4   A   No.
5   Q   Mr. Delsack didn't warn you about that?
6   A   I think he said something about it, but
7   it never happened.  And I told him that, and he --
8   Somebody told him about it, but it was erroneous
9   information.
10  Q   So your testimony under oath is that you
11  would not go to sleep on the way to --
12  A   After that first occasion, that was it.
13  Never happened again.
14  Q   You would, coming back from your home,
15  you would fly to Birmingham and instead of getting
16  a hotel room, you would just sleep in the airport,
17  wouldn't you?
18  A   Sometimes, yeah.
19  Q   On a bench?
20  A   Sometimes.  I didn't always fly,
21  sometimes I drove.
22  Q   Okay.  And then when you flew, the driver
23  would come by and wake you up at the airport?

Page 200

1   A   No, I had my alarm clock.
2   Q   Okay.  Well, and when you would go to
3   Colombia on that same plane that day, your back
4   would hurt sometime when you got down there?
5   A   Uh-huh.  (Witness indicates
6   affirmatively.)
7   Q   Was that from sleeping on a bench or --
8   A   Yeah, it'd make it stiff.
9   Q   Okay.
10
11     (Whereupon, a discussion was had off the
12     record.)
13
14     THE WITNESS:  That must have been one of
15  Gary's watch pictures, huh?
16  Q   (BY MR. LANKFORD:)  I don't know.  I have
17  no idea, I promise you I don't.
18  A   Yeah, the boat ride from the wooden pier
19  to the mooring area, especially where the capes go,
20  took about twenty, twenty-five minutes.  There
21  wasn't a whole lot else to do but kick back on the
22  boat.
23  Q   Well, so did you sleep then?

Page 201

1   A   No.  I was just resting my back there.
2   Q   Okay.
3
4     (Whereupon, Defendants' Exhibit 21 was marked
5     for identification and copy of same is
6     attached hereto.)
7
8   Q   (BY MR. LANKFORD:)  Okay.  Show you
9   Exhibit 21, which appears to be a letter in Spanish
10  to you dated June 20, 2002?
11  A   Uh-huh.  (Witness indicates
12  affirmatively.)
13     What about it?
14  Q   Did you refuse to sign it in Spanish?
15  A   Yeah.
16  Q   Why?
17  A   I didn't know what it said.
18  Q   Okay.
19  A   When I asked for an explanation, they
20  wouldn't give me one.
21     (Whereupon, Defendants' Exhibit 22 was marked
22     for identification and copy of same is
23     attached hereto.)

Page 202

1    Q   (BY MR. LANKFORD:)  All right.
2        Exhibit 23 appears to be an English
3    translation.
4        Exhibit 22, I'm sorry.
5        BY MR. HILLEREN:  Second page.
6    Q   (BY MR. LANKFORD:)  Yeah.
7        One is your resignation and the other one
8    is an acceptance of your resignation dated June the
9    20th?
10   A   Uh-huh.  (Witness indicates
11   affirmatively.)
12   Q   Do you remember that?
13   A   Yeah.  There's another page missing,
14   though.
15   Q   What's that?
16   A   There's another page like this where Rick
17   and Marc both signed it.
18   Q   Oh, I see.  Witnessing your signature?
19   A   Yeah.
20   Q   I've given you everything I have.
21   A   Yeah, there's -- there's another page
22   with him, and the reason --
23   Q   Well, there's some signatures right

Page 203

1    there.
2    A   No, there's another one like this
3    somewhere.
4    Q   Okay.  Okay.
5    A   They kept all the originals.
6    Q   Why did you sign it under protest?
7    A   Because I wasn't given an explanation.
8    They asked me to resign, and I said, well, what's
9    the explanation?  You know, why are you asking me
10   to resign?
11       And Rick Usery was real abrasive and
12   abrupt and told me, I ain't going to tell you a
13   damn thing, the decision's already been made, go
14   get your stuff, you got an hour to get out of here.
15   And I got in an argument with him.  I said, I'm
16   going to my room and pack, and he says, well, we'll
17   pack for you and send it.  Said, no, I'm going to
18   pack, and I said, I'm going to take all my things
19   with me when I leave.  And I said, if you don't
20   like it, you can do something about it, but I'm not
21   leaving without all my things.
22       So I went and did what I told him I was
23   going to do, and took a couple of hours, and I

Page 204

1    didn't hear any more from him.
2    Q   Is Usery still with Drummond?
3    A   I believe he is, yeah.
4    Q   You and Mr. Usery didn't get along too
5    well?
6    A   I thought we got along fine up until that
7    point.  I don't know what the problem was.  March
8    of this year they were willing to spend money to
9    move me to Birmingham to relocate, from March to
10   June.  I don't know what the problem was or what
11   happened, but that's typical of Drummond.  They did
12   that with Lloyd McEntire, they did it with Harry
13   Hughes, they did it with Dan, a couple of other
14   people.
15   Q   Did you agree to move your family to
16   Birmingham?
17   A   Told them I would.  They said -- Drummond
18   said they were going to pay for it.  They were
19   willing to spend about ten grand, is what they told
20   me.
21   Q   So, putting it mildly, you're not pleased
22   at the treatment that you received from Drummond?
23   A   Well, I'm puzzled.  Up until March of

Page 205

1    2002 they were patting me on the back, telling me
2    they were going to move me and my family to
3    Birmingham or wherever I chose, and everything was
4    wonderful.  And then from March to June --
5    Q   Something happened?
6    A   -- something changed.  And I suspect that
7    part of it is this.  In fact, I'm pretty sure
8    that's what it was.
9    Q   You think the specifications for repair?
10   A   Yeah, they -- I did what they asked me
11   to do, and I brought up too many questionable
12   areas.  I don't know that for sure, but that's what
13   I suspect.  And I never could get an explanation
14   from them, so I don't know.
15   Q   Okay.
16   A   In fact, I wanted an exit interview in
17   Birmingham to be away from -- to be away from
18   Colombia, from the management in Colombia, and it
19   was denied.
20   Q   You wrote, exit interview on there.
21   That's what you wanted?
22   A   That's what I wanted was an exit
23   interview in Birmingham to find out what the

Page 206

1  problem was, but I wanted to be away from the
2  Colombian management. And they refused.
3     Q   Who refused?
4     A   Marc Hawthorne and Rick Usery. That's
5  why I asked -- There's another, like I said,
6  there's another page missing where Marc and Rick
7  both signed this. And I wanted them to sign it
8  because I wanted an exit interview.
9     Q   Okay. Who would you have talked to in
10  Birmingham?
11     A   Personnel manager.
12     Q   Who was that?
13     A   I don't know who it was at that time.
14        Ron Richardson was the guy that was in
15  charge when I -- when I was hired on, but I think
16  somebody else took over.
17
18        (Whereupon, Defendants' Exhibit 23 was marked
19        for identification and copy of same is
20        attached hereto.)
21
22     Q   (BY MR. LANKFORD:) Okay. Let me show
23  you Exhibit 23, which appears to be a list of

Page 207

1  vessels. Ask you to look at that.
2     A   Okay.
3        What about it?
4     Q   I count thirteen vessels. Does that
5  appear to be all of the self-propelled vessels?
6     A   The crane barges aren't self-propelled.
7     Q   Well, you're right. I meant the dumb
8  barges, the open hopper barges.
9     A   Yeah, yeah. There was nineteen -- There
10  was nineteen coal barges there. But that looks --
11  That's all the floating assets, so to speak.
12     Q   All right. Okay. Were you ever a member
13  of the crew of any of these vessels on this
14  exhibit?
15     A   Only with regard to being a member of the
16  crew of the crane barges, in that I had to direct
17  the loading of the ships.
18     Q   And what member of the crew were you on
19  the crane barges?
20     A   Supervisor.
21     Q   On each of the crane barges?
22     A   All of them. You didn't stay on one
23  crane barge during the rotation. Crane barges that

Page 208

1  were alongside of ships were the crane barges that
2  you went on during the work -- during a shift. As
3  marine supervisor, I was part of the crew of those
4  barges.
5     Q   Were they Colombian flag barges, all of
6  this equipment on this exhibit?
7     A   I really don't know. I don't know if
8  they were Colombian flag or not.
9     Q   Were you assigned to any particular crane
10  barge?
11     A   All of them.
12     Q   All of them?
13     A   Yeah.
14     Q   Okay. And when you weren't on your
15  shift, when you were not on the, let's say the
16  crane barge COLOMBIA 4, who was the supervisor
17  aboard?
18     A   There was a specific crane supervisor for
19  each crane.
20     Q   For COLOMBIA?
21     A   Uh-huh. (Witness indicates
22  affirmatively.)
23     Q   And you were over them?

Page 209

1     A   Right.
2     Q   You were over the supervisors?
3     A   Right.
4     Q   The crane barges didn't have any galley
5  or any meal facilities, did they?
6     A   They had a place where you could eat,
7  but they didn't have a place to prepare food. They
8  usually had a microwave and a coffee pot.
9     Q   So, if the barge COLOMBIA 4 wasn't
10  performing right or the crane operator wasn't doing
11  a good job, you would tell the Colombian supervisor
12  of COLOMBIA 4 to get rid of the crane operator or
13  do something about it, would you not?
14     A   You couldn't get rid of anybody down
15  there.
16     Q   Well, let's say for some reason you
17  didn't think the barge was loading right or
18  correctly, you would say something to the Colombian
19  supervisor of the crane barge?
20     A   Right. I would give him direction, yeah.
21     Q   And did you do that from time to time?
22     A   Every day.
23     Q   Okay. Give me an example.

Page 210

1   A   If the crane operator was swinging over
2   the ship and had a lot of spillage, you know, I
3   would tell the crane supervisor, okay, you need
4   to call up there and tell that guy to tighten up,
5   you know, he's spilling too much coal.  Or if
6   he's swinging too far, or not unloading the barges
7   correctly or banging the barges, just any number of
8   things like that, you know, we'd have discussions
9   about it.
10  Q   Okay.  All right.  Were you an officer of
11  any of these vessels?
12  A   No, there wasn't any title like that.
13  Lloyd McEntire came up with that title of diving
14  officer.  That's the only time that term was ever
15  used.
16  Q   Okay.  You were not a member of the
17  Colombian crew of any of the crane barges?
18  A   I'm not Colombian.
19  Q   Right.  You'd have to be Colombian, don't
20  you?
21  A   To be a member -- To be a Colombian crew,
22  yeah.
23  Q   Well, to be a Colombian flag vessel.

Page 211

1   A   Yeah.
2   Q   Huh?
3   A   Yeah, I'm not sure if it was a Colombian
4   flag vessel.  I think a couple of the crane barges,
5   and I'm not sure which ones, possibly 1, 2 and 3,
6   were leased from a stevedore company that was down
7   there, or Tide -- Tide Marine, which is an American
8   company.  So I think they were all American-owned
9   vessels.
10  Q   All right.
11  A   But what flag they flew under, I couldn't
12  tell you because we never had a flag on the
13  vessels.
14  Q   Okay.  But you were not a member of the
15  crew or an officer of the EVITA, were you?
16  A   No.
17  Q   Or the EL CID?
18  A   Not an officer, no.
19  Q   Not a member of the crew, either?
20  A   Yeah, I was a member of the entire fleet
21  of crew.
22  Q   What were your duties as a crew member?
23  A   As a crew member, my duties were to

Page 212

1   direct the activities of the fleet in order to load
2   the ships.  So I was a member of the crew of the
3   entire fleet.
4   Q   You couldn't speak Spanish.  How did you
5   communicate with the --
6   A   I spoke some Spanish.
7   Q   Not much, though, did you?
8   A   Not much.  And we had -- we had a lot of
9   the Colombians spoke some English, so we managed.
10  Q   You were not an operating crew member of
11  any of the vessels on this exhibit, were you?
12  A   Sure, I was.
13  Q   Did you work on the deck of the vessels,
14  did you make fast the lines and handle the lines on
15  any --
16  A   No, no.
17  Q   Okay.
18  A   No.  But if you direct the operations and
19  direct the loading, you're an operating -- you're
20  an operating member.  You are performing work.
21  Q   You did not sign articles -- You know
22  what signing articles means?
23  A   Yeah, right.

Page 213

1   Q   -- on any of these vessels, did you?
2   A   No.
3   Q   As a crew member?
4   A   Nobody did.  To my knowledge, nobody did.
5   Q   You don't know whether the Colombians did
6   or not, do you?
7   A   I've had discussions with them about it.
8   Q   You weren't paid as a crew member of any
9   of these vessels, were you?
10  A   I was paid as a marine supervisor of the
11  fleet.
12  Q   Okay.  Any of these deep sea vessels that
13  you came to to either welcome or get them to sign
14  bills of lading, foreign-owned, foreign flag, they
15  were not owned, or operated, or controlled by
16  Drummond, were they?
17  A   No.  They were hired by Drummond or
18  chartered by the client to go to Drummond.
19  Q   Did you sleep ashore?
20  A   Yeah.
21  Q   Okay.  Did you eat ashore?
22  A   Only when I was off.
23  Q   Did you eat on the water?

Page 214

1    A   Yes.  I ate the same thing the crew ate.
2  Food was delivered to the vessels.
3    Q   Are you a member of any seamen's union?
4    A   No.
5    Q   You were not actually diving when you say
6  that you were hurt, were you?
7    A   No.
8    Q   And tell me what about the EVITA, did the
9  EVITA crew do anything wrong that caused your
10  accident?
11    A   No.
12    Q   Did anybody from the EL CID do anything
13  wrong that caused your accident?
14    A   No.
15    Q   Was there anything wrong with the EL CID?
16    A   Just the -- Just the chain in the
17  propeller.
18    Q   Was there anything wrong with the EVITA?
19    A   No.
20    Q   In about May of 2001, were you told by
21  Drummond that you were to spend more time, quote,
22  on the water, than you had before?
23    A   Yes.

Page 215

1    Q   Who told you that?
2    A   It was either Jay or Don Hamilton.
3    Q   And did you spend more time on the water
4  from that time on?
5    A   Yeah, yeah.  Because we were training
6  Gary Castillo to take over someday the same duties
7  that I had, far as beginning of the shift and the
8  end of the shift duties.  And they wanted Gary to
9  get more familiar with the beginning of the shift
10  and the end of shift duties.
11    So normally, when the shift ended, prior
12  to the shift ending I would go ashore and update
13  the status board on loading, because we had that
14  chart, hold, open ships, and I had to update the
15  cargo tonnage that was in hold so the next shift
16  would know where we are in the loading process.
17    And I usually went in at the end of the
18  shift and updated the status board and passed on
19  the information to the oncoming shift.  And they asked me
20  Gary to get familiar with that.  And they asked me
21  if I would mind letting Gary to start -- start
22  doing it, phase Gary in.  And I told them, no
23  problem, I would be happy to do it.

Page 216

1    Q   So, from that point on you spent more
2  time on the water than you had before?
3    A   Right, right.
4    Q   And prior to that time, do you have any
5  estimate of how much time you spent on land and on
6  the water?
7    A   Most of the shift, maybe eleven, eleven
8  and a half hours per shift out of twelve hours.
9    Q   On the water?
10    A   Yeah.
11    Beginning of every shift and the end of
12  every shift, you had to phase one crew into
13  another.  Beginning of the shift you had to meet
14  with the shift coming off and exchange information;
15  at the end of the shift you had to meet with the
16  crew coming on and exchange information, so the
17  process would be continuous.
18    And sometimes I would stay out, you know,
19  after they asked me to stay out more, sometimes I
20  would stay out.  Most of the time, I'd stay out.
21  Sometimes Gary would stay out, because Gary could
22  obviously speak Spanish and I couldn't, and there
23  was a problem with where somebody could communicate

Page 217

1  better than I could to stay out there.  So at those
2  times, I would come in early and Gary would stay
3  out, so we alternated duties from time to time.
4    Q   Okay.  And I believe you've testified
5  that no vessel caused your injury, that --
6    A   No.
7    Q   Okay.
8    A   No.  The thing that caused my injury was
9  the constant feud between maintenance and marine
10  operations, and mismanagement, in my opinion.
11    Q   You didn't lose any salary or
12  compensation as a result of your being off duty, I
13  think you said maybe twenty-four hours, did you?
14    A   No.
15    Q   They didn't dock your pay or anything?
16    A   No.
17    Q   And you have received all the benefits
18  from Drummond relative to your employment with
19  Drummond that would come to you as a result of your
20  resignation, of all of whatever you were due from
21  Drummond?
22    Am I making myself clear?
23    A   Not exactly.

Page 218

1    Q   All right.  Well, I'm saying whatever
2  pension or whatever plans you had, whatever
3  benefits you had from your employment from
4  Drummond, you have received?
5    A   As far as I know, yeah.
6    Q   Okay.  So they haven't held any money
7  back from you or anything like that?
8    A   No, no.
9    Q   Your medical treatment has been, for your
10  injury has been furnished by Drummond, has it not?
11    A   Yes, up until I -- until I left, yeah.
12  Till I left Drummond.
13    Q   Well, what have you paid for since then?
14    A   I mean, I haven't really done anything
15  else since I left Drummond.  When I left Drummond,
16  my insurance terminated, and I didn't have any more
17  medical insurance.
18    Q   All right.
19    A   I still don't have medical insurance.
20    Q   But I'm saying, Drummond paid for your
21  treatment while you were employed by them?
22    A   Right.
23    Q   Your medical treatment?

Page 219

1    A   Right.
2    Q   And, in fact, Drummond has paid for
3  Dr. Grabowski's bills and all that?
4    A   Right.
5    Q   You hadn't paid for it, anyway?
6    A   Right.
7    Q   And, in fact, Drummond has paid for
8  Dr. Fleet's bills down here, haven't they?
9    A   That's what I understand.
10    Q   Okay.  So as far as you know, unless your
11  lawyer says I'm wrong, you are not due any medical
12  bills?
13    A   No, they didn't pay that one.
14    Q   What's that?
15      BY MR. HILLEREN:  Well, this is
16  Doc. Murphy, but.
17      THE WITNESS:  I don't even remember what
18  that was.  It wasn't much.
19    Q   (BY MR. LANKFORD:)  What was that about?
20      I'm sorry, you told me.
21    A   That was prior to going to see Dr. Fleet.
22  I was trying to find somebody local that could
23  evaluate the MRIs and look at my back.

Page 220

1    Q   Okay.  Yeah.
2    A   And she deferred and told me that I need
3  to see somebody more specialized than her, that she
4  thought my back injury was something that needed
5  attention right away.  In her words, she said it
6  was a time bomb waiting to go off, that I needed to
7  see somebody more specialized than she was.
8      I think it was like sixty dollars for an
9  office visit or something like that.  It wasn't
10  much.
11    Q   When was that?
12    A   That was whenever Dr. Fleet's visit was,
13  it was probably a week prior.
14    Q   May?
15    A   Yeah.
16    Q   May of this year?
17    A   Yes.
18    Q   Approximately?
19    A   Yeah, about.  It was sometime the week
20  before I went to Dr. Fleet.
21    Q   Did you take the Birmingham MRIs to her?
22    A   Yeah.
23    Q   And she read them?

Page 221

1    A   Yeah.  She looked at them, and she said,
2  yeah, you have two herniated discs, you need to get
3  it looked at right away.
4      BY MR. LANKFORD:  Is this mine, or are
5  you going --
6      BY MR. HILLEREN:  You're welcome to make
7  a copy.
8    Q   (BY MR. LANKFORD:)  She's from your home
9  town?
10    A   Yes.
11    Q   Do you know her personally?
12    A   No.
13    Q   Who referred you to her?
14    A   No one, it's just one of those walk-in
15  medical places.
16    Q   Doc-in-the-box?
17    A   Pretty much.
18
19    (Whereupon, a discussion was had off the
20    record.)
21
22      THE WITNESS:  Yeah, I found her to be a
23  very good doctor.

Page 222

1    Q   (BY MR. LANKFORD:) You have credit
2   cards, don't you?
3    A   Yes.
4    Q   Okay. What kind, who are they? I don't
5   want the numbers.
6    A   Well, can I ask why you want to know
7   that?
8    Q   I'll get them another way, that's all
9   right. I'm going to file a motion to compel.
10    A   I would just like to know what you want
11   them for.
12    Q   I don't know, depends on what they show.
13        Have you made any trips out of the
14   country?
15    A   Yeah.
16    Q   Where did you go?
17    A   Israel, December.
18    Q   Of 2003?
19    A   Yeah.
20    Q   And what was the purpose of your trip?
21    A   Work.
22    Q   For whom?
23    A   For Oceans Technology.

Page 223

1    Q   Were you able to fly and get over there
2   and back and do your job?
3    A   Yeah, they flew me first class, so I
4   slept all the way there and back, almost had a bed
5   on the plane.
6    Q   All right. Have you made any other trips
7   abroad since your injury?
8    A   No.
9    Q   Been to London?
10    A   Yes, but not -- not since I left
11   Drummond. I thought you wanted before I went to
12   work for Drummond.
13    Q   I see. And what was your reason?
14    A   Vacation. My wife and I went for our
15   anniversary.
16    Q   I've asked you, and you don't know what
17   you made in 2001 and 2003?
18    A   No, but if you got a computer, I can find
19   it for you real fast.
20    Q   Okay.
21
22        (Whereupon, a discussion was had off the
23        record.)

Page 224

1    Q   (BY MR. LANKFORD:) You went to see
2   Dr. Grabowski in Birmingham like in February, the
3   month following your accident?
4    A   Uh-huh. (Witness indicates
5   affirmatively.)
6    Q   And he told you that you were fit for
7   duty, did he not?
8    A   He told me that he wouldn't recommend
9   performing any surgery, he asked me if I was in any
10   pain and I told him yeah, but I could manage it
11   with over-the-counter medication from time to time.
12   And he said, well, keep doing that and wrote me a
13   couple of prescriptions for muscle relaxers and
14   painkillers. I never did fill them.
15    Q   Did you ask him for a Viagra
16   prescription?
17    A   No.
18    Q   Do you take Viagra?
19    A   Yeah.
20    Q   Did you take it before you were hurt?
21    A   No, I didn't.
22    Q   You take it now?
23    A   Occasionally.

Page 225

1    Q   Did you go see Dr. Fleet?
2    A   Yes.
3    Q   What did he tell you?
4    A   Not much, he looked at the MRI and said,
5   yeah, you got two herniated discs.
6    Q   Did he restrict your activities in any
7   way, say not to go to work, not do anything?
8    A   No. He just told me, whatever I'm doing,
9   he said, keep on doing it.
10    Q   Are you making more money after you say
11   you were hurt than you were before?
12    A   It depends how much work comes. When the
13   phone rings, I go to work. I don't have any set
14   schedule.
15    Q   Okay.
16    A   Sometimes I make more, sometimes I make
17   less.
18    Q   Okay. But whatever it is will be on that
19   disk there, won't it?
20    A   Yeah, yeah.
21    Q   In 2004 have you filed any income tax
22   quarterly?
23    A   No.

Page 226

1   Q   You have not?
2   A   No.
3   Q   Have you been busy in 2004?
4   A   Couple of months, yeah. Couple of months
5   we were real busy, and I had about a month and a
6   half dry spell where I didn't do hardly anything.
7   Q   So your sole employer is --
8   A   Oceans Technology.
9   Q   -- Oceans Technology. Okay.
10       Are you available for other work if
11  people call you?
12  A   No.
13  Q   Why?
14  A   I don't work for anybody else.
15  Q   You don't want to work for anybody else?
16  A   I don't work for anybody else. This
17  fellow's kept me reasonably busy, and so I show him
18  my loyalty by being available for him.
19  Q   All right. If somebody else called you
20  for work, would you go to work for them?
21  A   Depends what the job was. If they want a
22  one-day job, no, I wouldn't. If they call up and
23  say, we got a six-month job, I probably would.

Page 227

1   Q   What about your loyalty?
2   A   Well, I mean, he'll understand that.
3   Q   Okay. Has this somebody called you and
4   you've come to him, or who is Ocean -- Who would
5   you go to, this Leask, L-E-A-S-K?
6   A   Yeah, Linden Leask, yeah.
7   Q   Leask?
8   A   Yeah.
9   Q   Have you been to him saying, I've gotten
10  this offer from somebody else to go to work, is it
11  okay with you?
12  A   Yeah, I have.
13  Q   In 2004?
14  A   In -- No. Well, once in 2004 and
15  once last year. What we ended up doing was
16  going through -- I took the job through Oceans
17  Technologies. I gave Linden the job, but I had
18  exclusive rights to perform the job, so I had
19  pretty much sold the jobs to Oceans Technology.
20  Q   Do you usually stay at home until you get
21  a telephone call?
22  A   Yeah.
23  Q   Have you put your name out in the job

Page 228

1   market as being available for work?
2   A   Yeah, I'm on Monster all the time.
3   Q   What's Monster?
4   A   It's a Internet job service. They list
5   jobs. You know, something looks like it's
6   something I can do, I'll e-mail them a resume.
7   Q   Okay.
8   A   Always looking for a job with benefits,
9   which is something I don't have now and can't get.
10  Q   Have you called any marine offshore
11  companies personally and --
12  A   Yeah.
13  Q   Who have you called?
14  A   Oceaneering, Global Divers, Cal Dive,
15  Smith Salvage, Titan Marine, what else? Several
16  different companies, I forgot on the --
17  Q   Are jobs pretty tight now?
18  A   Yeah. Yeah, I got a couple of things
19  going against me. I got two herniated discs, which
20  as soon as they find out about that, I get told,
21  well, insurance companies won't let us hire you.
22  Q   Who told you that?
23  A   A bunch of people I know, informally.

Page 229

1   People that are like presidents of companies and
2   personnel managers.
3   Q   Okay. If you know the president that
4   well, looks like he'd hire you.
5   A   Well, he said he's constrained by
6   insurance company rules. He said he wouldn't even
7   attempt it.
8
9       (Whereupon, a discussion was had off the
10      record.)
11
12       THE WITNESS: One of the other things is
13  my age. That's unofficial, you know, they're not
14  supposed to be able to do that.
15       BY MR. LANKFORD: I understand. Off the
16  record.
17
18       (Whereupon, a discussion was had off the
19      record.)
20
21  Q   (BY MR. LANKFORD:) You've given some
22  doctors a list of things -- And I can't find it, I
23  don't know where it is -- but you say that you

Page 230

1  can't do as well, and I think sex comes up at the
2  top?
3      A   Uh-huh.  (Witness indicates
4  affirmatively.)
5      Q   Am I basically right?
6      A   Yeah.  I don't know if it's on top, but
7  it's on there.
8      Q   You're not -- This has hurt your sex
9  life, you say that?
10     A   Yeah, yeah.
11     Q   Viagra hadn't helped that?
12     A   Viagra doesn't do anything for
13 positioning.
14     Q   And you blame Drummond for that?
15     A   I blame my back being sore as to
16 limiting my ability to get into various --
17 different positions that I used to be able to
18 get into.
19     Q   Well, has it occurred to you that the
20 older you get, the less efficient you become at
21 certain activities, or have you reached that age
22 yet?
23         I'll tell you, I have.

Page 231

1      A   I haven't.
2      Q   Sir?
3      A   I haven't.
4      Q   You haven't what?
5      A   I haven't reached that age yet.
6      Q   Okay.  All right.
7      A   I got a wife fourteen years younger than
8  me that loves me very much, so I'm doing okay.
9      Q   All right.  You can't run marathons
10 anymore?
11     A   No.
12     Q   Did you ever run a marathon?
13     A   Yes.
14     Q   How many?
15     A   About fifteen.
16     Q   Where did you run?
17     A   Mostly the New Orleans area, I ran Lake
18 Pontchartrain Causeway five times.  They used to
19 have a race there every year.
20     Q   My kids have done that.  What years was
21 that?
22     A   I quit running marathons in late '80s,
23 early '90s.

Page 232

1      Q   All right.  What else is on that list?
2      A   I don't remember.  I do have it in my
3  truck, though.
4      Q   Well --
5      A   About holding my grandkid, my grandson.
6  I can't hold my grandson for too long, or bend over
7  to pick him up too much, or -- I used to work on
8  cars a lot more than I worked on them now; and I
9  can't do that as much as I used to.
10     Q   I noticed some of your income came as a
11 mechanic in 2002, I think?
12     A   Yeah.  Yeah, I worked for about three
13 months as an alignment mechanic.
14     Q   In your home town?
15     A   Yeah.  That was just a fill-in job,
16 and I told the guy that's all I wanted to do was
17 alignments, I didn't want to do anything else.
18 Anything else would require too much physical
19 effort.
20     Q   Anything else you want to add to your
21 testimony that I haven't covered?
22     A   I think you pretty much got it.
23         BY MR. LANKFORD:  That's all I got.

Page 233

1          BY MR. HILLEREN:  I don't have anything.
2  Thank you.
3
4          FURTHER DEPONENT SAITH NOT
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 234

```
 1              CERTIFICATE
 2
 3   STATE OF ALABAMA )
 4   MOBILE COUNTY    )
 5
 6        I hereby certify that the above and
 7   foregoing deposition was taken down by me in
 8   stenotype, and the questions and answers thereto
 9   were transcribed by means of computer-aided
10   transcription, and that the foregoing represents a
11   true and correct transcript of the testimony given
12   by said witness upon said hearing.
13        I further certify that I am neither of
14   counsel nor of kin to the parties to the action,
15   nor am I in anywise interested in the result of
16   said cause.
17
18
19
19
20        _____
20        DEANNA FAYE JONES
21        NOTARY PUBLIC
21
22
23
```